In the Matter of Debra Alice
SCHUSTER, Debtor.

FAMILY FEDERAL CREDIT
UNION, Plaintiff,

v.

Debra Alice SCHUSTER, Defendant.

Bankruptcy No. 2–85–01057.
Adv. No. 2–86–0059.

United States Bankruptcy Court,
D. Connecticut.

Jan. 14, 1987.

Nicholas A. O'Kelly, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for plaintiff.

John F. Delaney, Delaney & Delaney, Hartford, Conn., for debtor-defendant.

MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

At issue in this litigation is the dischargeability of a debt owed Family Federal Credit Union (credit union) by the debtor, Debra Alice Schuster. An evidentiary hearing held on November 13, 1986, established the following factual background.

I.

The debtor, on August 24, 1983, applied to the credit union (apparently then named St. Francis Hospital Hartford Federal Credit Union) for a loan. As requested by

the credit union, she filled out and submitted a document entitled "Personal and Credit Information" (credit application). On September 6, 1983, the debtor executed an "Open End Credit Loan Agreement and Truth-In Lending [sic] Disclosure" (credit agreement) which the parties agree entitled the debtor to borrow periodically from the credit union sums not to exceed $5,000.00 outstanding after the most recent advance. The credit agreement, in paragraph 2, provides that "[e]ach request for an advance will require our approval. We may refuse any requested advance for any reason. For example, we may refuse to advance because of changes in the economy or changes in your or our financial condition."

The credit union made two immediate advances to the debtor on September 6, 1983, one for $3,273.89 to pay off an existing forty-eight-month term loan with the credit union made three months earlier, and a second advance for $1,000.00 to pay bills. The debtor took subsequent advances of $400.00 on October 3, 1983, for car repairs; $300.00 on October 27, 1983, for car repairs; $194.00 on November 11, 1983, to purchase a computer; and $350.00 on July 10, 1984, for car repairs. During this ten-month period, the credit union did not request any financial information from the debtor at the time of each advance. The debtor filed a chapter 7 petition on December 5, 1985, listing $15,783.46 in liabilities and $1,150.00 in assets (household goods, apparel, and a 1973 automobile), all claimed exempt.

The credit union's complaint alleges that its loan balance of $4,992.31 is nondischargeable because the debtor obtained the loan by use of a materially false financial statement, issued with intent to deceive, on which the credit union reasonably relied. *See* 11 U.S.C. § 523(a)(2)(B). The credit union claims to have established the debtor's fraud by comparing the debt information listed by the debtor on the credit application with the liabilities shown on her bankruptcy petition. There are four such debts appearing in the bankruptcy schedules, but not on the credit application. Three of those debts are credit card accounts, and the fourth is a debt due Mechanics Savings Bank for $1,235.84, representing a student loan. The debtor testified that no monies were due on the credit card accounts on the date of the credit application, but acknowledged that the student loan was then in existence. She stated that she was a part-time student at the time, no payments were required on the loan, and she did not understand that she had to list the student loan as an obligation. Frank Levanti, the loan officer who handled the debtor's credit application, testified that he relied solely upon the application in approving the credit line of $5,000.00, and that no independent credit check was made either of the debts or of the assets which the debtor listed on the credit application. The debtor filled out the credit application on her own; no person from the credit union discussed the contents with her; no questions were asked of her; and she did not read the "black box", hereinafter described.

## II.

### A.

■ At the outset, it should be noted that based upon the record in this proceeding, any recovery by the credit union would be limited to the "fresh cash" advanced upon the approval of the debtor's $5,000.00 credit line, that is, the sum in excess of the $3,273.89 received by the credit union to pay off its pre-existing debt. There has been no attempt to show that the prior loan was fraudulently obtained or that the purpose of the latter loan was to extend, renew, or refinance credit. *See Household Fin. Corp. v. Danns (In re Danns)*, 558 F.2d 114, 116 (2d Cir.1977) ("[O]nly that portion of the credit obtained as a result of a fraudulent statement should be barred from discharge."). Section 523(a)(2)(B) "codifies the reasoning expressed by the Sec-

ond Circuit in *In re Danns*, 558 F.2d 114 (2d Cir.1977)." 124 Cong. Rec. H 11,095–96 (9/28/78); S 17,412–13 (10/6/78).

## B.

The credit application utilized by the credit union for the debtor's loan is a printed form with average-size black print on white paper. It apparently was supplied to the credit union by a national organization. Questions of a general, personal nature take up about two-thirds of the page. Toward the bottom of the page are six horizontal lines divided vertically into eight segments under the headings: *Name, Address, Original Amount Borrowed or Charged, Date, Purpose, Monthly Payment, Balance Owed, Are You Current?* Above these lines, the page has been blackened and extremely small, white type is used (black box). The wording is exceedingly difficult to decipher. In fact, the credit union at the trial initially introduced into evidence, as its Exhibit No. 3, a photocopy of the credit application. When it became apparent that it was impossible for the court or counsel to read the language in the black box, the credit union introduced the original credit application as its Exhibit No. 4. The wording, culled from the black box, is as follows:

> Credit references and outstanding obligations, including amounts charged on credit cards. Complete all spaces. First list all present obligations and then paid accounts as references. Attach additional listing, if necessary. Include all accounts which you and a spouse are permitted to use or for which you and a spouse have signed an agreement to repay.

The credit union, in its post-trial memorandum, concedes it presented no evidence to contradict the debtor's testimony that there was nothing due on the credit card accounts at the time she filled out the credit application. The credit union focuses upon the portion of the black-box wording which states that the debtor shall "list ... paid accounts as references" and shall "[i]nclude all accounts which you and a spouse are permitted to use". It argues that the lack of anything due on the debtor's credit card accounts "does not excuse the Debtor from reporting the existence of such accounts. This is especially the case where although there may be no charges due and owing on certain credit cards, there is nevertheless a potential for significant charges (as was the case here) which could and in fact did impair the Debtor's ability to repay its loan to the Plaintiff." *Credit union memorandum* at 4.

The credit union's argument is founded on a discredited function of a credit application. The debtor completed a credit application without instruction and filled out the lines which, to her thinking, called for listing only existing debts on which periodic payments were currently to be made. She cannot be held accountable for failing to decipher the language in the black box requiring her to list charge accounts on which nothing was then due, for use as "references." The credit union would have the court find the debtor liable for actual fraud because she did not follow unclear instructions printed in unreasonably small type. The size of the print, the use of the black background, the location of the black box, the language ambiguously mixing debts and credit references for listing—all suggest a motive in the minds of those responsible for the drafting of this form, a motive which Congress has condemned.

In 1970 Congress formed a Commission on the Bankruptcy Laws of the United States to recommend changes in the substance and administration of the bankruptcy law. *See Klee, Legislative History of the New Bankruptcy Code*, 54 Am.Bankr. L.J. 275, 277 (1980). The Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess. (1973) (the Report), formed the basis for the Bankruptcy Code enacted in 1978. Evidence of creditor-induced false financial statements led the

Commission to recommend the elimination of the nondischargeability of a consumer debt obtained by the use of a false financial statement. The Report stated:

Substantial evidence of the abuse of this exception by creditors has come to the attention of the Commission. The exception has also generated a substantial amount of litigation and partially frustrated the "fresh start" goal of the discharge. On balance, the abuses and the harmful effects far outweigh the benefit to creditors by this exception. No evidence has come to the Commission's attention that indicates the exception has any prophylactic effect.

*Report*, Pt. I at 176.

Congress chose not to eliminate the exception from the Bankruptcy Code, but it recognized the problem and the House Judiciary Committee proposed attorney fee provisions as a compromise "to balance the scales more fairly in this area ... The present pressure on the honest debtor to settle in order to avoid attorney's fees in litigation on a creditor-induced false statement is eliminated. The creditor is protected from dishonest debtors by the continuance of the exception to discharge." H.R. Rep. No. 595, 95th Cong., 1st Sess. 131, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5963, 6092. The final draft of the Bankruptcy Code contained a provision for the payment of attorney fees to a prevailing debtor.[1] *See Beneficial Fin. Co. of Conn. v. Majewski (In re Majewski)*, 7 B.R. 904 (Bankr.D.Conn.1981). I find that the form of financial statement on which this proceeding is based tends to induce debtor noncompliance.

■ A party who objects to the dischargeability of a debt has the burden of proving all of the facts essential to sustain the objection by clear and convincing evidence. *Barwick v. Brewer (In re Brewer)*, 66 B.R. 214, 217 (Bankr.S.D.N.Y.1986). A finding of intent to deceive is unwarranted when an omission on a credit application can reasonably be laid to a defect in the format of the credit application combined with a lack of instruction by a lender to a loan applicant. *See Martha's Vineyard Coop. Bank v. Andrews (In re Andrews)*, 33 B.R. 970, 973 (Bankr.D.Mass.1983); *Waterbury Community Fed. Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662, 670 (Bankr.N.D.N.Y.1981). The credit union has failed to establish that the debtor submitted the credit application with intent to deceive the credit union.

### C.

In view of the conclusion in subsection B, it is not necessary to address the further question of whether the credit union could have relied reasonably upon the credit application when an advance of some of the monies occurred ten months after the submission of the credit application. *See First Bank v. Nacol (In re Nacol)*, 27 B.R. 116, *amended* 30 B.R. 193 (Bankr.M.D.Fla. 1983).

### III.

Judgment may enter that the debt of Debra Alice Schuster to the Family Federal Credit Union be discharged.

This Memorandum shall constitute Findings of Fact and Conclusions of Law mandated by Bankruptcy 7052. It is

SO ORDERED.

---

1. This provision, as modified in 1984, is § 523(d).