In re Maurice A. WIMBISH, Debtor.

ALLEGHENY COUNTY (PA) UNITED STATES GOVERNMENT EMPLOYEES FEDERAL CREDIT UNION, Plaintiff,

v.

Maurice A. WIMBISH, Defendant,

and

Maurice A. Wimbish, Debtor.

Maurice A. WIMBISH, Plaintiff,

v.

ALLEGHENY COUNTY (PA) UNITED STATES GOVERNMENT EMPLOYEES FEDERAL CREDIT UNION, Defendant.

Bankruptcy No. 87–2283.
Adv. Nos. 87–0454, 88–180.

United States Bankruptcy Court,
W.D. Pennsylvania.

Jan. 26, 1989.

Joseph P. Covelli, Jefferson Boro, Pa., for creditor/credit union.

Ralph J. Ruggiero, Pittsburgh, Pa., for debtor.

Stephen I. Goldring, Pittsburgh, Pa., Asst. U.S. Trustee.

---

1. Only two (2) loans are in question in this case; that of September of 1986 and April of 1987.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Creditor's Objection to the dischargeability of its claim in Debtor's bankruptcy case, and Debtor's Complaint to avoid preferential payments made to Creditor. Specifically, the issues to be addressed are as follows:

(1) Is the debt owed to Plaintiff nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code?

(2) Does Debtor have standing to bring a preference action?

(3) If Debtor does have standing to bring a preference action, did a preference occur pursuant to § 547(b), and do any of the exceptions thereto under § 547(c) apply?

A trial was held on these issues, and the parties have submitted post-trial memoranda. Based upon same, and this Court's further research, we find that the debt owed to this Creditor is not dischargeable. We further find that Debtor has not received Court permission, nor does he have standing to bring the instant preference action; however, even if Debtor did have Court approval, he would be unsuccessful in his pursuit in the present case.

## FACTS

Debtor is employed as a revenue officer for the Internal Revenue Service, earning approximately $28,000.00 annually. As a United States government employee, Debtor had the option to join, and did in fact join, the Allegheny County (PA) United States Government Employees Federal Credit Union (hereinafter "Credit Union").

On several occasions Debtor sought and received unsecured loans from the Credit Union.[1] In each case Debtor was required to complete a very simple application, requesting specific information, *inter alia,* the amount to be borrowed, the repayment period and method, and the purpose of the

Any sums due and owing on money borrowed prior to September, 1986, are dischargeable.

loan.[2] Of particular interest in the instant case is the purpose section of each application, as it is these descriptions which the Credit Union asserts give rise to its Complaint.

The Credit Union's application form asks for the purpose of the loan and requires full explanation. One of its witnesses, the local branch manager, testified that a loan would not be granted if the applicant listed the purpose as simply "personal"; a specific and concrete purpose was and is required. This witness also stated that loans *could* be made for the purpose of debt consolidation, but that two (2) caveats would be maintained:

(1) The loan must be used to fully pay the other debt, i.e. the loan could not be used solely to cure an arrearage and bring a debt current; and

(2) any such loan must be made jointly payable to the Credit Union member and the individual creditor.

This witness further testified that Debtor had chosen payroll deductions as the means of payment, and that no payments had been missed prior to the bankruptcy filing.

The Credit Union's head teller, outlined the factors considered in loan approvals:

(1) Income/Debt ratio;

(2) Purpose; and

(3) Credit check

On Debtor's September 9, 1986 application, he explained his purpose as follows:

Home improvements. Front wall is falling down & needs replaced [sic] & roof is leaking. Needs new roof.

This loan application was denied, apparently due to a problem with the credit report. Upon learning of the denial, Debtor wrote a letter to the Credit Union Loan Committee, which stated as follows:

I recently applied for a loan to repair my house [sic] the loan was reject-

ed because my credit report showed a charge off. I pay my bills so I went to the credit bureau to see what it was being charged off. The charge off was placed by National Credit Corp. for my European Health Spa membership. I have paid them about $500.00. The balance of $100.00 is disputed because they claim that these are late charges. On $500.00 to have to pay $100.00 in late charges that I was not informed about until after I was paid in full is not right or fair.

I am having a statement placed on my credit report (attached) explaining this. I pay my bills but I don't think I should have to pay what I didn't agree to. *The men are waiting to start the work on my house [sic] they had planned to start on Friday 9–12–86. They can't start without the money from the loan.* The loan will be payroll deduction. I have been doing my job for 4 years. Your money to repay the loan is guaranteed. *I need the check Friday 9–12–86. If I have to I will bring a check or money order down in an envelope addressed to National Credit & pay the disputed amount. Please help me with this.* I can be reached at ... on Friday.

Thank you,
/s/ Maurice A. Wimbish

(emphasis added.)

Thereafter the Loan Committee reviewed and approved the loan on September 16, 1986.[3]

Prior to filing the loan application, and also prior to writing the above letter, Debtor had received notification from Spring Hill Savings and Loan Association of Pittsburgh (hereinafter "Spring Hill") of its intent to foreclose its mortgage on Debtor's residence. Clifford Beatty, Vice President of Spring Hill, testified that Debtor received Act 91 Notice Of Commonwealth

---

**2.** Debtor was also required to complete certain financial data at the time he applied for the September 1986 loan. Although certain questions have been suggested as to the veracity of said information, Plaintiff has not raised a § 523(a)(2)(B) objection, and therefore, the issue is not analyzed in this Opinion.

**3.** The requested loan amount was changed from $2,800.00 to $3,800.00. It is not possible from the testimony or otherwise to determine who changed the application; however, Debtor did in fact obtain the full $3,800.00, and we will proceed based upon that sum.

Assistance and Act 6 Notice Of Intention Of Mortgagee To Foreclose notices, as required under Pennsylvania law, by both regular and certified mail. Said notices were sent on September 3, 1986, and Mr. Beatty's records show the certified mail was picked up on September 5, 1986. Furthermore, Spring Hill's documentation relating to the notice of delinquency, and signed by Mr. Beatty on September 9, 1986, indicate his having spoken to Debtor after his receipt of same.

This delinquency, in the amount of $1,745.16, was paid to Spring Hill on September 19, 1986, two (2) days after Debtor received the loan. Within three (3) days thereafter, Debtor wrote two (2) additional checks for "cash", totaling $220.50, and between September 15th and September 30th, withdrew an additional $135.00. Between September 16th and September 30th, Debtor also paid Kaufmann's department store $112.00; Irving Schiffman Jewelers, $531.00, as a deposit on an engagement ring; Johnston The Florist, $102.80, for flowers for his fiancee; Burton's Sign Sales, $167.02, for football pennants; and National Industrial Bank, $400.00, as partial payment on an expensive car stereo system for his customized van.

Debtor testified he can no longer remember the name of the workmen he had hired to fix his roof on September 12, 1986, and they did not do the work because Debtor did not have the money on that date. While Debtor stated he had received several estimates for the repair work, he saved none of them. Debtor further testified he had ultimately hired a friend, with no particular roofing experience, to perform the work, paid him in cash, and has no independent recollection of the exact amount, going so far as to say he did not want to be "pinned down" to a particular amount. We note however, that during the month of September, from the date of the loan until the end of the month, a cash total of only $350.50 was withdrawn.

Debtor made his second loan application on April 9, 1987, and requested the sum of $2,300.00. Under the purpose section, Debtor wrote the following:

Home improvements. Roof is leaking & front wall fell down.

When the head teller was questioned on cross-examination about her approval of a second loan for the same purpose without further investigation, she stated she had no reason to believe Debtor's requests were untrue. She assumed the final repair costs were higher than originally anticipated.

Debtor received the second check on April 10, 1987. Three (3) days later, Debtor made an additional payment to Spring Hill in the sum of $1,357.64. Prior to making this second loan application, Debtor was again delinquent in his mortgage payments and had sent a check for partial payment to Spring Hill, with the following note:

Cliff,

Expecting tax refund very soon. Need another 30 days. Enclosed is $350.00 so you won't have to take action. I appreciate the extra time.

Thanks,

/s/ Maurice A. Wimbish

Mr. Beatty testified that the partial payment was returned to Debtor on April 7, 1987, because Spring Hill required payment in full. On April 10, 1987, the total delinquency of $1,354.64 was paid.

When questioned about the home improvements performed in relation to the loan's stated purpose, Debtor testified he again had his friend perform some minor roof repairs, and again paid cash. However, from April 10th to April 23rd, Debtor made only $40.00 in cash withdrawals from his account, and wrote only one (1) check for "cash" in the amount of $110.00. Debtor also paid a utility bill of $145.22 and a cable television bill of $102.34. Debtor has admitted to using the money borrowed from the Credit Union to reduce his mortgage arrearages; he also knew of the Credit Union's policy regarding debt consolidation payments being made directly to the creditor, and disallowing loans solely to *cure* arrearages.

## ANALYSIS

Section 523(a)(2)(A) of the Bankruptcy Code states in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

■ Because the philosophy of our bankruptcy law is to provide the *honest* debtor with a fresh start, exceptions to dischargeability must be strictly construed against the creditor, and in favor of the debtor. The burden is on the creditor to prove the exception by clear and convincing evidence. *Matter of Van Horne,* 823 F.2d 1285 (8th Cir.1987); *In re Phillips,* 804 F.2d 930 (6th Cir.1986); *In re Hunter,* 780 F.2d 1577 (11th Cir.1986); *In re Gans,* 75 B.R. 474 (Bankr.S.D.N.Y.1987); *Matter of Schuster,* 69 B.R. 352 (Bankr.D.Conn.1987); *In re Hammill,* 61 B.R. 555 (Bankr.E.D.Pa.1986); *In re Fenninger,* 49 B.R. 307 (Bankr.E.D. Pa.1985).

Pursuant to § 523(a)(2)(A), the elements which must be proved are as follows:

(1) The obtaining of money, property, services, or an extension, renewal, or refinance of credit by a debtor;

(2) use of a false representation pertaining to a past or present fact;

(3) knowledge that the representation is false or asserting said representation as fact with reckless disregard for its truth or falsity;

(4) an intent to deceive the other party or induce the other party to act based upon said representation;

(5) a reasonable reliance by the creditor upon said misrepresentation; and

(6) a resultant detriment to said creditor.

*In re Burgstaler,* 58 B.R. 508 (Bankr.D. Minn.1986). *See also, In re Goldstein,* 66 B.R. 909 (Bankr.W.D.Pa.1986), and cases cited therein. The parties stipulate that Debtor received money from the Credit Union and, as the debt has not been fully paid, it has suffered a resultant detriment.

Debtor disputes the accusation that he made a false representation upon which the Credit Union relied.

In the case of both loans, Debtor submitted applications, wherein the purpose sections specifically involved home improvements, *inter alia,* roof repair and repair of an exterior wall. After the first loan was rejected, Debtor went so far as to write a lengthy letter to the Loan Committee. That letter described, with great emotive language, the pendency of the work to be done, with the workers standing at the ready to perform.

■ As to each of the loans, Debtor was presently aware that foreclosure proceedings against his real estate were imminent. He also knew he did not have the requisite funds on hand to satisfy those debts. Debtor was aware of the Credit Union policy against extending personal loans solely for the curing of arrearages on other debts. This prior knowledge indicates that Debtor made false representations relating to past or present facts, when he stated that the full amount of the loan in question was necessary to repair his residence. Even disregarding the many and various other sundry uses Debtor made of the funds in question, at the time the applications were made, his statements of purpose showed a reckless disregard for their truth or falsity.

Several courts have held that when a debtor acquires monies on the condition that they be used for a specific purpose, and the debtor has no intention of abiding by such a restriction, said debt can be properly held nondischargeable. *See Matter of Pappas,* 661 F.2d 82 (7th Cir.1981); *In re Gans, supra; In re Jones,* 50 B.R. 911 (Bankr.N.D.Tex.1985).

Debtor contends he had no intent to deceive the Credit Union, nor did he intend for them to rely solely upon the representation made in the purpose section of his application; rather, he contends that the purpose section was of little or no importance. Evidence of a debtor's intentions may be obtained from circumstantial evidence, since direct evidence of his state of mind is normally unavailable in an action of

this type. *Matter of Van Horne, supra; In re Gould,* 73 B.R. 225 (Bankr.N.D.N.Y. 1987); *In re Goldstein, supra; In re Fenninger, supra.* While Debtor claims the purpose made no difference, and that he had no intention of deceiving the creditor, his actions prove otherwise. Before each loan application was made, Debtor was severely delinquent in his mortgage payments. In the case of the first application, foreclosure notices under Pennsylvania law had already been sent to Debtor by regular and registered mail. At the time of the second application, Debtor's attempt at partial mortgage payment had been rejected, and additional foreclosure proceedings loomed on the horizon. Debtor knew that payment of arrearages was not a satisfactory purpose for obtaining a loan through the Credit Union and knew that listing same as his purpose would have resulted in those requests being denied. Debtor, having shown a complete incapacity for handling money in any rational manner, borrowed extensively and regularly from the Credit Union for items such as auto repair, and vacations. In fact, of the first $3,800.00 loan in question in this case, less than one-half (½) was used to pay the mortgage on Debtor's property to a current status. The remaining sums were used to make payments toward the purchase of various items such as an engagement ring, flowers, an automotive stereo system and football pennants. Only a very small portion of the funds borrowed were allegedly used for the purposes listed in the application; and for those items Debtor can provide no receipts, no estimates, and no indication of payment.

The analysis used by the Court in *In re Mistry,* 77 B.R. 507 (Bankr.E.D.Pa.1987) is very appropriate to the case at bar. In that case, Defendant used Plaintiff's money for a different purpose than that for which it was intended. The Court determined that the touchstone of its decision was an issue of credibility, specifically, the adverse credibility determination made as to the defendant. In making such determination the Court stated:

> The refusal of the Defendant to provide any specific explanation or documentary evidence of where the money actually went is extremely suggestive of a lack of credibility on his part on this very important point.

*Id.* at p. 512.

This Court wholeheartedly agrees. We are able to document a substantial number of disbursements by Debtor, based upon the sums received from the loan application, the deposit of said sums in his bank account, and the writing of various checks and withdrawals of cash. But nowhere are we able to determine when and how much was spent, *if anything,* on the roof and wall repairs at his home. Debtor did not even bring or attempt to bring the alleged workman as a corroborative witness.

The final element to be determined in this dischargeability action is the reasonableness of the creditor's reliance upon the misrepresentation. The determination of reasonableness must be made by evaluating all the facts and circumstances of the particular case. *In re Phillips, supra; In re Gould, supra.* Although the creditor need not prove that it relied solely on a particular misrepresentation, it must show that the misrepresentation would have made a difference. *In re Simpson,* 29 B.R. 202 (Bankr.N.D.Iowa 1983); *In re Drewett,* 13 B.R. 877 (Bankr.E.D.Pa.1981).

The Credit Union representatives testified in a credible fashion, that the purpose listed in the application was of substantial importance, and would affect the loan's approval. In fact, one witness stated that a particularly important purpose could cause approval in a close case. This witness further testified there was no reason to doubt the veracity of the purpose stated by Debtor; to the contrary, it appeared that the need for additional funds was a result of the applicant's underestimation of the actual costs involved in such work when making the original loan application. The misrepresentation certainly made a difference in the loan approval, as the creditor's policy would have caused it to disallow loans merely for the cure of mortgage arrearages.

Plaintiff having proved all of the necessary elements of § 523(a)(2)(A) by clear and convincing evidence, an Order will be entered rendering this debt nondischargeable.

We turn now to the other issues before the Court for determination under § 547 of the Code. Specifically, Debtor seeks to set aside payments made to the Credit Union, on or within ninety (90) days prior to the filing of his bankruptcy petition. The Credit Union has responded, both procedurally and substantively.

Initially, they challenge Debtor's standing to pursue this action, claiming that only the trustee, as a representative of the estate, has the right and/or duty to bring a preference action. In the alternative, if we find that Debtor does have the requisite standing, the Credit Union argues that any payments received during the 90-day preference period are excepted from avoidance, as being payments made in the ordinary course of Debtor's financial affairs.

Section 547(b) of the Bankruptcy Code, which is the relevant text in this matter, states in pertinent part:

(b) Except as provided in subsection (c) of this section, *the trustee may avoid* any transfer of interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within ninety (90) days before the date of the filing of the petition; ...

(5) that enables such creditor to receive more than such creditor would receive if— ...

(B) the transfer had not been made;

...

(emphasis added).

The parties agree that standing in a § 547 matter is vested in a trustee, a Chapter 11 debtor-in-possession, or a Chapter 13 debtor, who is also a debtor-in-possession with a capacity to sue. At least one court

has stated that such standing belongs to a trustee, a debtor-in-possession, or any party authorized by the Court to bring such an action on the trustee's behalf. *See Matter of Hoyos Precsas,* 73 B.R. 338 (Bankr.D.P.R.1987). At least one appellate court has stated that while a chapter 11 debtor-in-possession has trustee-like authority, such authority is terminated when a bankruptcy court converts such a case to chapter 7. In that case, the debtor was not permitted to maintain a suit against creditors once that conversion took place, unless and until the trustee participated in said suit. *See Vreugdenhil v. Hoekstra,* 773 F.2d 213 (8th Cir.1985).

While the general rule is that the trustee, as the representative of the estate, is the only party who may seek to recover a preferential transfer, many courts have held that a chapter 7 debtor may assert the trustee's power to avoid such a preferential transfer by way of § 522(h) of the Bankruptcy Code. That section states in pertinent part:

(h) The debtor may avoid a transfer of property of the debtor ... to the extent that the debtor *could* have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—

(1) such transfer *is* avoidable by the trustee under section ... 547 ... of this title ... *and*

(2) the trustee *does not* attempt to avoid such transfer.

(emphasis added).

Subsection (g)(1) states in pertinent part:

(g) ... the debtor may exempt under subsection (b) of this section, property that the trustee recovers under § ... 542 ... of this title, to the extent that the debtor *could* have exempted such property under subsection (b) of this section if such property had not been transferred, if—

(1)(A) such transfer was *not a voluntary* transfer of such property by the debtor; *and*

(B) the *debtor did not conceal* such property; . . .

(emphasis added).

The above statutory language can be synthesized into four (4) conditions which must be met in order for the chapter 7 debtor to possess the trustee's power to avoid a preferential transfer:

(1) the trustee must not have sought and must not seek to avoid the transfer;

(2) the trustee must have had the ability to avoid the transfer under § 547;

(3) the transfer the debtor wishes to set aside must have been involuntary and not concealed; and

(4) the property the debtor seeks to recover must be exemptible.

*In re Ricke,* 84 B.R. 408 (Bankr.W.D.Pa. 1988); *In re Weaver,* 78 B.R. 135 (Bankr.N. D.Tex.1987); *Matter of Washkowiak,* 62 B.R. 884 (Bankr.N.D.Ill.1986); *In re Ward,* 36 B.R. 794 (Bankr.D.S.D.1984).

■ Debtor's attempt to pursue this preference must fail on at least two (2), and perhaps three (3) counts. First, the trustee has not advised the court that he has abandoned his right and interest in this cause of action. However, as will be stated, *infra,* this Court does not believe that such an action exists and therefore, we do not expect that the trustee will pursue same.

Second, is the question regarding the voluntary nature of the transfer. There is nothing before us to show that Debtor was in any way coerced into making any payments. Each of the payroll deductions was within Debtor's control, and in fact, payroll deduction was the repayment method chosen by Debtor. These payroll deductions were not made under any particular legal compulsion, and the payment did not arise as by a creation of a lien, by operation of law, or by the fixing by a tribunal of a judicial lien. Debtor voluntarily chose to take these loans. As a consequence, he was required to repay them. He had the option of choosing the repayment method and the length of repayment terms. This Court would be hard pressed to envision a more voluntary payment.

■ Finally, the Court does not believe the trustee could have avoided this transfer under § 547 of the Code. Although the payments themselves would meet all of the elements of a preferential transfer, these transfers fall within the exception stated in § 547(c)(2)(B):

(c) the trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was made—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The parties have agreed that all payments made to the Credit Union, including those made within ninety (90) days of the filing of the bankruptcy petition, were made timely and according to form. A long-term loan by a consumer debtor is unquestionably within the ordinary course of that debtor's financial affairs. All of these payments were based upon wage withholdings to which Debtor agreed, and were made in a regular, consistent manner, with no omissions or unusual activity prior to the bankruptcy. These payroll deductions were clearly made in the ordinary course of Debtor's financial affairs. *See In re Butler,* 85 B.R. 34 (Bankr.D.Md. 1988). Having so stated, Debtor's Complaint to recover preferential transfers must be dismissed.

An appropriate Order will be entered.