In re UNION BANK OF THE
MIDDLE EAST, LTD.

In re Jatinder Kumar
LUTHRA, Debtor.

No. CV 90–1120.

United States District Court,
E.D. New York.

May 22, 1991.

Berger & Steingut by Peter R. Stern, New York City, for Union Bank of the Middle East.

Macco, Hackeling & Stern by Steven Hackeling, Huntington, N.Y., for Jatinder Kumar Luthra.

## MEMORANDUM ORDER

WEXLER, District Judge.

Plaintiff–Appellant, Union Bank of the Middle East, Ltd. ("Union Bank"), appeals from an order of the United States Bankruptcy Court, Eastern District of New York, (Holland, J.), dated February 20, 1990, denying in its entirety Union Bank's claim to have the $954,306.81 debt of Defendant–Appellee, Jatinder Kumar Luthra ("Luthra"), declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) ("§ 523(a)(2)(A)"). Union Bank also appeals from the Bankruptcy Court's ruling on October 26, 1987, holding the deposition of Rolando S. Alcala, a non-party witness not available at time of trial, inadmissible at trial. Finally, Union Bank appeals from the Bankruptcy Court's denial on November 16, 1987 of its request to amend the complaint to add a claim declaring the debt nondischargeable pursuant to 11 U.S.C. § 523(a)(4) ("§ 523(a)(4)").

This Court has jurisdiction under 28 U.S.C. § 158(a) to hear this appeal and review the findings of the Bankruptcy Court. Although many of the facts are not in dispute, where the facts are controverted the Court will cite into the record.

## I. BACKGROUND

From 1979 until June of 1983, Luthra, a Tanzanian national, conducted an international import/export business known as Eureka Sherjah ("Eureka UAE") in the United Arab Emirates (UAE). In April of 1982, Luthra formed a New York company known as Eureka General Trading Inc. ("Eureka NY"). Rolando S. Alcala ("Alcala") was hired to run the company while Luthra was in the UAE. Eureka NY maintained a corporate bank account at Manufacturer's and Trader's Trust Company ("M & T"). Luthra, listed as president, was allowed to sign checks singly, while Alcala, listed as vice-president, Luthra's wife, Yasmin ("Yasmin"), and Luthra's attorney, Jonathan Avirom, could sign checks jointly.

In February of 1983, Luthra, on behalf of Eureka UAE, opened an account with Union Bank, a bank based in the UAE. Thereafter, at Luthra's request, two lines of credit were established with Union Bank: (1) local bills discounting; and (2) letters of credit. Luthra accepted and personally guaranteed each of these lines of credit.

The "local bills discounting" line of credit was a type of accounts receivable whereby Union Bank would accept and cash postdated third-party checks made payable to Eureka UAE. In June of 1983, Luthra presented to Union Bank nine checks payable to Eureka UAE. These checks, having an aggregate value of $130,803.44, were accepted and cashed by Union Bank and the account of Eureka UAE was credited accordingly. Subsequently, all nine of these checks were returned unpaid. Although Union Bank sought to rescind the credit it had advanced Eureka UAE, the credited funds had already been almost completely withdrawn.

A few months earlier, Luthra had incorporated a second New York company known as Femme Inc. ("Femme"). Yasmin became Femme's sole shareholder, but was not actively involved in the company. Alcala, the sole employee of Eureka NY, also served as Femme's sole employee. Thereafter, Eureka UAE contracted to buy certain goods from Femme. To secure payment for these goods, Eureka UAE opened seven irrevocable letters of credit with Union Bank in favor of Femme. These seven letters of credit, having an aggregate value of $730,285.73, were subsequently cashed

by Femme and the proceeds deposited in Femme's account at M & T.

The funds advanced by Union Bank for the discounted checks and letters of credit were never repaid. Accordingly, on December 23, 1985, a judgment in favor of Union Bank in the amount of $954,306.81 was entered against Luthra in the New York State Supreme Court, Suffolk County. Approximately one month later, Luthra filed a voluntary petition in bankruptcy listing personal assets totalling $1,910. Union Bank then commenced the adversary proceeding underlying this appeal, alleging that the debts owed by Luthra were nondischargeable pursuant to § 523(a)(2)(A).

In particular, it was alleged that Luthra defrauded Union Bank when he presented the nine checks for discounting, since, Union Bank argued, the nine checks were drawn by Luthra himself. (Amended Complaint at A.[1] 28–29). Union Bank also alleged that the transactions that took place between Eureka UAE and Femme were sham transactions and that Luthra never intended to pay for the goods shipped under the letters of credit, nor to honor his personal guarantee to repay Union Bank for credit extended. (*Id.* at A. 30–33). Finally, Union Bank alleged that Luthra fraudulently represented the type, quantity, and value of the goods that Eureka UAE purchased from Femme under the seven letters of credit. (*Id.* at A. 33–34.)

Luthra did not dispute that Union Bank was damaged in the amount of $954,306.81. Rather, he contended, or at least did up until the time of trial, that the nine checks were, in fact, third-party checks drawn by Eureka UAE's customers. (A. 318). Further, with respect to the shipment of goods under the seven letters of credit, Luthra did not deny the allegation of fraud. Instead, he contended that any fraud involved in that transaction was perpetrated by Alcala, who acted solely on his own behalf. Additionally, Luthra denied the allegations that he controlled Femme and that he never intended to pay for the goods shipped by Femme. (A. 334–35).

Judge Holland, after hearing six days of testimony and reviewing all of the evidence presented to the Bankruptcy Court, denied Union Bank's claim in its entirety. Accordingly, the debt of Luthra was discharged.

## II. DISCUSSION

### A. NONDISCHARGEABILITY OF DEBT

The purpose of the bankruptcy law is to " 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.' " *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) (quoting *Williams v. U.S. Fidelity & Guar. Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915)). This is accomplished by allowing an individual debtor to file a voluntary petition for relief under Chapter 7 of the Bankruptcy Code to have his debts discharged, as provided by 11 U.S.C. § 727. However, § 523(a)(2)(A) provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

§ 523(a)(2)(A) (footnote omitted).

This statutory provision prevents a dishonest debtor from using the bankruptcy law to shield his wrongdoing.

 In its opinion below, the Bankruptcy Court properly set forth the standard for determining nondischargeability of a debt pursuant to § 523(a)(2)(A). This standard consists of the following five-prong test: (1) the debtor made representations; (2) the debtor knew that the representations were false at the time they were

---

1. "A." refers to Appendix.

made; (3) the representations were made with the intent to deceive the creditor; (4) the creditor relied on the representations; and (5) the creditor was injured by the representations and suffered damages as a result. *In re Shaheen*, 111 B.R. 48, 51 (S.D.N.Y.1990) (citations omitted); *accord Matter of Newmark*, 20 B.R. 842, 853–54 (Bankr.E.D.N.Y.1982). The party objecting to discharge must prove each element of the test by clear and convincing evidence in order to establish a prima facie case of nondischargeability. *In re Tesmetges*, 86 B.R. 21, 24 (E.D.N.Y.1988); *Matter of Newmark*, 20 B.R. at 853. However, if the creditor establishes a prima facie case, the burden of going forward shifts to the debtor. *Carini v. Matera*, 592 F.2d 378, 380–81 (7th Cir.1979); *see also Matter of Newmark*, 20 B.R. at 853. It should be noted that the Bankruptcy Court addressed only the first two prongs of the test. Therefore, this Court likewise limits its analysis.

## B. THE NINE DISCOUNTED CHECKS

To succeed on its claim of nondischargeability pursuant to § 523(a)(2)(A), it was necessary for Union Bank to prove each and every element of the test set forth above. As stated, the first prong of this test requires the creditor to prove that the debtor made a representation. Therefore, Union Bank had the burden of proving that Luthra made a representation at the time he presented the nine checks for discounting.

Representations have generally been categorized into two groups: express representations and implied representations. Courts have found that these two categories of representations have direct support in the statute. As stated in *Matter of Newmark*, "A *false representation* is an express misrepresentation, while a *false pretense* refers to an implied misrepresentation of 'conduct intended to create and foster a false impression.'" 20 B.R. at 854 (emphasis added) (quoting *In re Schnore*, 13 B.R. 249, 251 (Bankr.W.D.Wis.1981)). It is to be noted that due to the "conceptual difficulty attending such a fine differentiation," courts typically do not differentiate

between the two phrases. *Id.* ((citing *In re Schnore*, 13 B.R. at 252) (additional citation omitted)).

At trial, there was no dispute that it was Luthra who presented the nine checks. There was a dispute, however, as to whether Luthra made an express representation at the time of presentment. The Bankruptcy Court found that Union Bank had failed to prove, by clear and convincing evidence, that Luthra made such an express representation. This finding by the Bankruptcy Court constitutes a finding of fact and, therefore, cannot be set aside unless it is found to be clearly erroneous. Bankr.Rule 8013, 11 U.S.C.A. (West Supp.1990). A finding is clearly erroneous " 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, *reh'g denied*, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 (1948)). Upon reviewing the "entire evidence," this Court concludes that the Bankruptcy Court's finding that Union Bank failed to prove, by clear and convincing evidence, that Luthra made an express representation, is not clearly erroneous and, therefore, must be affirmed.

After finding that Union Bank had failed to prove an express representation, the Bankruptcy Court considered whether Luthra's conduct constituted an implied representation. The Bankruptcy Court found that Luthra's mere act of presenting the checks for discounting created an implied representation that the checks were third-party checks. The Court further found that such an implied representation was actionable under § 523(a)(2)(A) and, therefore, was sufficient to satisfy the first prong of the five-prong test.

These findings by the Bankruptcy Court constitute findings of law since they involved a determination of whether particular conduct was sufficient to satisfy a legal standard. The questions considered by the Bankruptcy Court were whether the mere

act of presenting the nine checks to Union Bank for discounting constituted an implied representation that the checks were third-party checks and, if so, whether such a representation would be actionable under § 523(a)(2)(A). These are questions of law and will be independently reviewed by this Court. *In re Tesmetges*, 86 B.R. at 23 (citations omitted).

In applying § 523(a)(2)(A), courts typically have found implied representations in two contexts: (1) when a debtor uses a credit card to charge purchases, *see, e.g.*, *In re Hinman*, 120 B.R. 1018, 1021 (Bankr. D.N.D.1990), or (2) when a debtor makes payment with a check that is subsequently dishonored. *See, e.g., In re Miller*, 112 B.R. 937, 940 (Bankr.N.D.Ind.1989) (footnote omitted). With respect to the former, the majority of courts take the position that "[t]he use of a bank or credit card is an implied representation to the issuer that the holder has both the intent and ability to pay the issuer for the charged purchases and advances." *In re Hinman*, 120 B.R. at 1021 (citations omitted). With respect to the latter context, there appears to be a split of authority concerning "whether the mere giving of a check that is subsequently dishonored, without more proof, is an actionable representation under § 523(a)(2)(A)." *In re Miller*, 112 B.R. at 940 n. 1 (citations omitted).

■ The Bankruptcy Court found that Luthra's conduct in presenting the nine checks for discounting constituted an implied representation. On review, it might appear that this Court simply has to consider which approach courts in this circuit have taken with regard to dishonored checks. However, that is not the case. The situation at hand does not involve a party making payment with a check that is subsequently dishonored. Rather, it involves a party presenting checks to a bank, not as payment for any debt, but for the purpose of discounting. Further, the practice of discounting is not a procedure available to any member of the public; it is a

line of credit that must be pre-established with a bank. As such, there are specific rules and regulations imposed by the bank on the use of this type of credit line. For example, in the case at hand, Union Bank had agreed to discount third-party checks made payable to Eureka UAE during its normal course of business. Since it had not agreed to discount any other type of check, it would only be reasonable for the bank to conclude that the nine checks presented by Luthra were, in fact, third-party checks.[2]

Based on the particular circumstances involved with the process of discounting, this Court finds that the mere act of presenting checks to a bank for discounting carries with it an implied representation that such checks are, in fact, third-party checks. Accordingly, the Bankruptcy Court's finding that the first prong of the five-prong test has been satisfied is affirmed.

■ The second prong of the test requires that the creditor prove that the debtor knew the representation was false at the time it was made. With respect to this prong, the Bankruptcy Court framed the issue as follows: "whether the nine checks presented by Luthra for discounting were third-party checks or checks drawn by Luthra himself." (A. 18). The Bankruptcy Court then stated that it found "Luthra's responses on cross-examination inadequate to prove by a clear and convincing standard that the discounted checks were not third-party checks." (*Id.*) The Bankruptcy Court noted that the checks themselves bore no indication as to who had drawn and signed them and, further, that Union Bank had introduced no other evidence on the issue, such as a witness or handwriting expert who could identify the signature on the checks. (A. 19). The Bankruptcy Court concluded that Union Bank had failed to prove that Luthra signed the checks. In summary, the Bankruptcy Court held that Union Bank had failed to make a prima facie showing, by clear and

---

2. Apparently, because of the banking practices in the UAE, the checks in question could not be identified facially as third-party checks.

convincing evidence, that the representations that Luthra made were, in fact, false, and that Luthra knew them to be false when he made them.

For the reasons stated below, this Court finds that these factual findings are clearly erroneous and, therefore, cannot stand. Union Bank never had the burden of proving that Luthra, himself, signed the checks. It simply had to prove that the checks were not third-party checks and that Luthra knew they were not third-party checks when he presented them to Union Bank for discounting.

The record as a whole supports no other conclusion but that the checks were not third-party checks and that Luthra knew they were not third-party checks at the time of presentment. First, all nine of the checks were eventually returned unpaid to Union Bank; three of the checks returned were stamped "signature differs." (A. 1013, 1019, 1022). There was irrefutable proof that one of the nine checks was drawn on a Eureka UAE account at the Middle East Bank Ltd. (A. 1021, 1078). On direct examination, Luthra stated that he recognized the signature on this particular check as that of Hassan, an employee of Luthra. (A. 520). Until trial, Luthra had taken the position that the checks were all third-party checks. He did so in a sworn affidavit to the New York State Supreme Court. (A. 971). In his answer to the amended complaint, Luthra denied that the nine checks were drawn by him, his wife, or entities controlled by him. (Answer at A. 139). In his sworn response to an interrogatory, Luthra described the checks as being from "various purchasers of merchandise." (A. 146). However, when confronted with the checks, Luthra admitted on the stand that he recognized Hassan's signature on three of the checks and stated "I admit, well, they are—Put it this way, I admit they are our own checks." (A. 521). In fact, Luthra actually testified that "they look like they are *all* of our checks." (*Id.*) (emphasis added). Moreover, on redirect, when Luthra was asked whether he had testified that all of the checks presented were his, Luthra replied, "That is correct." (A. 917).

In sum, the evidence submitted by Union Bank, together with Luthra's testimony, leads this Court to conclude that the nine checks presented for discounting were not third-party checks. There is simply no other conclusion that can be drawn. Still, Union Bank had to prove that Luthra knew at the time of presentment that the nine checks were not third-party checks. The Bankruptcy Court held that Union Bank had failed to do so by clear and convincing evidence. However, this finding by the Bankruptcy Court is clearly erroneous and cannot stand.

"[I]n assessing the debtor's awareness or knowledge to determine liability for fraud, the courts will scrutinize the acumen and experience of the debtor." *Matter of Newmark*, 20 B.R. at 857. Luthra was an experienced businessman with a business management degree in marketing and international trade. (A. 838). He had over sixteen years experience in commodity importing, (A. 834), and, at one point, the Bankruptcy Court found him qualified to testify as an expert on some aspects of international business and trade. (A. 837, 841). On the stand, Luthra testified that he intended to replace the nine checks with his customer checks before presentment, and that he never intended that these checks be cashed. (A. 871–72). This testimony clearly supports the conclusion that Luthra knew at the time of presentment that the checks were not third-party checks.

The requirements for nondischargeability pursuant to § 523(a)(2)(A) are strict. *Id.* at 853. As previously stated, the creditor is required to prove, by clear and convincing evidence, each of the five prongs of the test set forth above. Still, despite this heavy burden, a court must not be unreasonable. Although the bankruptcy laws allow a party to start over, they cannot allow a party to benefit from prior fraudulent activity. "Our bankruptcy law cannot be so liberally applied in the debtor's favor as to permit the discharge of a debt which would not have exited *but for* the debtor's fraudulent conduct." *Id.* (emphasis in original). Considering the record as a whole,

the only conclusion that can be drawn is that Union Bank, at a minimum, established a prima facie case with respect to the second prong of the test. Therefore, the finding by the Bankruptcy Court that Union Bank failed to satisfy the second prong of the test is reversed and the issue remanded with directions for the Bankruptcy Court to complete the analysis of the five-prong test.

## C. THE SEVEN LETTERS OF CREDIT

█ Similarly, the Bankruptcy Court considered Union Bank's claim regarding the seven letters of credit in light of the five-prong test. With respect to the first prong, the Bankruptcy Court found that Luthra had made an implied representation of his intent to repay the credit extended. The Bankruptcy Court reached this conclusion by accepting Union Bank's argument that "[t]he case at bar is analogous to cases involving credit cards wherein an implied misrepresentation has consistently been held to be demonstrated by the debtor's presentment of his card, and his signature on the credit receipt." (A. 21). This Court also finds that logic convincing and holds that Luthra made an implied representation of his intent to repay the credit extended each time a letter of credit was negotiated. Additionally, the Bankruptcy Court found that Luthra had made a representation as to the type, quantity, and value of goods purchased. Again, this Court agrees that such a representation was, in fact, made by Luthra. Accordingly, the finding by the Bankruptcy Court that the first prong of the five-prong test was satisfied is affirmed.

█ With respect to the second prong of the test, the Bankruptcy Court found that the record was insufficient to support a factual conclusion that Luthra controlled Femme and had directed Femme to engage in sham transactions with Eureka UAE. The Bankruptcy Court also found that although Luthra had made an implied representation of his intent to repay the credit extended, Union Bank had failed to prove, by clear and convincing evidence, that Luthra knew such representations were false,

and that, in fact, they were false. Finally, the Bankruptcy Court found that although Luthra had made a representation as to the type, quantity, and value of goods purchased, Union Bank had failed to prove, by clear and convincing evidence, that Luthra knew such representations were false, and that, in fact, they were false.

Again, these factual findings are clearly erroneous and cannot stand. First, Femme was incorporated at the direction of Luthra. His wife, Yasmin, was listed as the sole shareholder. Although Luthra testified at trial that his wife had, at all times, owned 100% of Femme, (A. 530), he had previously testified at a deposition that he owned the company. (A. 531–32). Additionally, in his response to Union Bank's interrogatories, Luthra stated that Yasmin had been president of Femme since its incorporation. (A. 141). However, signature cards for Femme at National Bank of North America ("NBNA") listed Luthra as president. (A. 1120). Further, in a lawsuit filed by Femme, Luthra signed the complaint as president of the company. (A. 1138–40). Finally, on direct examination, Yasmin testified that for the years 1983–1987, Femme was run entirely by her husband. (A. 624). The only conclusion that can be drawn from this evidence is that Luthra, in fact, had substantial control of Femme.

Turning to the particular transactions in question, at the time Luthra applied for the first four letters of credit, totalling approximately $248,000, Femme not only did not have any funds available to fill these orders; it did not even have a bank account. Femme's bank account at M & T was not established until June 10, 1983, (A. 1069), in time to receive $143,876 in funds from the first two letters of credit issued by Union Bank. Moreover, Luthra never gave Alcala authority to draw funds from Femme's account. (A. 506–07, 1140). Thus, to fill over $730,000 worth of orders, Alcala only had access to the funds in Eureka NY's account, and even then, Alcala could not withdraw these funds without a second signature. The argument that Luthra, a businessman with over 16 years experience in commodity importing, realistically could

have expected Femme to be able to fill these orders is simply untenable.

Nevertheless, goods were shipped to the UAE by Femme. At approximately the same time, Luthra and Yasmin left the UAE for New York. Thereafter, the goods shipped by Femme arrived in the UAE. (A. 324–25). Eureka UAE, however, neither picked up nor paid for any of the goods. (Amended Complaint at A. 27). Instead, Luthra instructed Union Bank to advise its correspondent bank in New York to "accept documents with discrepancies." (A. 999). Eventually, Union Bank seized the goods and, upon opening the containers, found that Femme's shipping invoices were fraudulent and that only minimal goods had been shipped under each letter of credit. (Plaintiff–Appellant's Brief at 11). In fact, the goods actually shipped by Femme, for which Femme was paid $730,285.73, were of negligible value and eventually were resold for $29,195.49. (Amended Complaint at A. 34).

At the time that Luthra arrived in New York, the last five letters of credit (totalling $623,035.90) still had not been cashed by Femme. These funds were deposited into Femme's account at M & T on July 20, 1983. On July 21, 1983, Luthra transferred almost all of Femme's funds to Eureka NY's account at M & T. (A. 1058, 1070). On that same day, he withdrew $700,000 from the account and invested it in a seven-day Eurodollar note. (A. 772, 1058). In addition, on July 21, 1983, Luthra opened

an account for Femme at the NBNA. (A. 1118). The only people with signing authority for this account were Luthra, as president, and Yasmin, as vice-president. (A. 1120). Within the next week, Luthra transferred $980,000 to Femme's account at NBNA. (A. 1118–19). Finally, between August 12, 1983 and August 25, 1983, Luthra transferred $1,027,355.55 into Yasmin's account at NBNA. (A. 1153–65).

Luthra clearly had control over the money in question, and he used that control to shift the money from account to account, until it was finally deposited into Yasmin's account at NBNA. This type of conduct[3] is completely contrary to Luthra's contention that any fraud involved in this case was committed by Alcala, acting solely on his own behalf.

Simply stated, the record as a whole does not support the findings made by the Bankruptcy Court. The only conclusion that can be drawn is that Union Bank, at a minimum, established a prima facie case with respect to the second prong of the test. Therefore, the finding by the Bankruptcy Court that Union Bank failed to establish the second prong of the test is reversed and the issue remanded with directions for the Bankruptcy Court to complete the analysis of the five-prong test.

## D. ALCALA DEPOSITION

In the proceedings below, the Bankruptcy Court set a January 30, 1987 discovery cut-off date. This date was later

---

**3.** The Court notes that testimony at trial revealed that prior to leaving the UAE, Luthra opened letters of credit with banks other than Union Bank. For example, Algemene Bank Nederland NV ("ABN"), another UAE bank, had opened, at Luthra's request, a letter of credit for $175,000 in favor of Femme. Shipments of goods made under this letter of credit were found to be fraudulent and ABN sued Luthra. It was only after ABN obtained an order of attachment against Luthra in New York Supreme Court, New York County that Luthra agreed to repay the $340,000 debt owed to ABN (inclusive of other debts owed by Luthra to ABN). On August 25, 1985, Luthra made a partial repayment of $180,000 to ABN. David Deegan, a vice-president of ABN, testified that Luthra made the $180,000 payment in one-hundred dollar bills that he carried in a briefcase. (A. 475).

That same day, the attachment was released and Luthra signed an agreement to repay the remaining $159,284 debt (plus interest) to ABN. In the agreement, Luthra represented that he "presently [had] no assets and [was] presently unable to repay ABN...." (A. 1087). Luthra did not have any assets on that date because he had previously transferred $1,017,355.55 into Yasmin's account at NBNA. When ABN learned of this account and asked NBNA to freeze it to secure the debt owed to ABN, Luthra repaid ABN in full. (A. 1091–92). The same day that ABN asked NBNA to freeze a portion of Yasmin's account, she withdrew $667,664.57 from her account and deposited that amount into an account for her brother, Amiroli F.D. Abadabhai. (A. 1167).

extended to March 13, 1987 by stipulation of the parties. Alcala was scheduled to be deposed on March 11, 1987. However, he was unable to attend and Union Bank's counsel, Brenda Harms, telephoned Luthra's counsel, C. Steven Hackeling, to request an adjournment. She was informed by Mr. Hackeling that it did not matter when the deposition was taken because he had no intention of appearing for it. The Alcala deposition was eventually taken on March 26, 1987 without Mr. Hackeling in attendance.

Luthra argued that the Alcala deposition was taken outside the time period set for discovery. Union Bank, on the other hand, argued that Luthra's counsel had specifically agreed to extend the discovery period for the purpose of taking the Alcala deposition. Further, it argued that Mr. Hackeling was aware of the postponement and, therefore, could have attended the deposition if he had so desired. On October 26, 1987, the Bankruptcy Court held a hearing on Union Bank's motion *in limine* which sought to have the deposition testimony of Alcala allowed into evidence at trial. After an exhaustive hearing on the subject, Judge Holland ruled that the deposition of Alcala had been taken outside the time period set for discovery and, therefore, was inadmissible.

Union Bank argues on appeal that the decision was incorrect as a matter of law. In particular, it argues that the failure of counsel to appear at a duly noticed deposition does not necessarily affect the admissibility of deposition testimony and that Mr. Hackeling waived his opportunity to cross-examine Alcala.

Union Bank appears to have missed the point. The question was not whether Mr. Hackeling had waived his opportunity for cross-examination, but, rather, whether the deposition should have been taken at all. Simply put, the question was whether the deposition was taken within or without the discovery cut-off date. As noted, Judge Holland ruled that the Alcala deposition was taken outside the time period set for discovery and, therefore, was inadmissible at trial. The use of a deposition at trial is a matter of discretion for the trial court and will not be overturned except for an abuse of that discretion. *Bobb v. Modern Products, Inc.,* 648 F.2d 1051, 1055 (5th Cir.1981) (citations omitted); *see Duttle v. Bandler & Kass,* 127 F.R.D. 46, 49 (S.D.N.Y.1989). The ruling by the Bankruptcy Court clearly was not an abuse of discretion and, further, was not erroneous as a matter of law. Accordingly, the ruling by the Bankruptcy Court excluding the Alcala deposition is affirmed.

E. REQUEST TO AMEND COMPLAINT

On November 16, 1987, Union Bank made an oral request to amend its complaint to add a claim declaring the debt nondischargeable pursuant to § 523(a)(4). No such cause of action was asserted in its complaint, amended complaint, or in its pretrial statement of issues. Union Bank first raised a § 523(a)(4) cause of action in the Bankruptcy Court's chambers on the morning of the trial. (Defendant–Appellee's Brief at 24). Luthra's attorneys claimed prejudice and surprise, at which point, the Bankruptcy Court determined that the trial would be limited to the scope of the pretrial statements submitted by Union Bank. (*Id.*)

Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given," this type of amendment lies within the discretion of the trial court, *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 801, 28 L.Ed.2d 77 (citation omitted), *reh'g denied,* 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971), and is not subject to review upon appeal except for an abuse of that discretion. *Evans v. Syracuse City School Dist.,* 704 F.2d 44, 47 (2d Cir.1983) (citation omitted). When considering whether to allow such an amendment, the paramount factor to be weighed is prejudice to the parties. *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981). In the case at hand, Luthra clearly would have been prejudiced by Union Bank's proposed amendment. It cannot be said that Judge Holland abused his discretion in denying Union Bank's request. Accordingly, the Bankruptcy Court's ruling is affirmed.

## CONCLUSION

The decision of the Bankruptcy Court is hereby affirmed in part, reversed in part, and the case remanded for further proceedings consistent with this opinion.

SO ORDERED.