In re Jatinder Kumar LUTHRA, Debtor.

UNION BANK OF the MIDDLE EAST, LTD., Plaintiff–Appellee–Cross Appellant,

v.

Jatinder Kumar LUTHRA, Defendant–Appellant–Cross Appellee.

No. CV 94–2322.

United States District Court, E.D. New York.

May 24, 1995.

Judgment Implementing Memorandum May 26, 1995.

Hershman & Leicher, P.C. by Michael L. Steindam, New York City, for plaintiff-appellee-cross appellant.

Zukerman, Spaeder, Goldstein, Taylor & Kolker by Edward J.M. Little, Lisa A. Cahill, New York City, for defendant-appellant-cross appellee.

*MEMORANDUM AND ORDER*

WEXLER, District Judge.

Debtor–Appellant, Jatinder Kumar Luthra ("Luthra"), appeals from an order of the United States Bankruptcy Court, Eastern District of New York, Holland, J., dated March 25, 1994, declaring a $701,090.24 debt owed by him to Appellee–Cross Appellant, Union Bank of the Middle East, Ltd. ("Union Bank") nondischargeable, pursuant to 11 U.S.C. § 523(a)(2)(A). *Union Bank of the Middle East Ltd. v. Luthra (In re Luthra)*, No. 86–0031–21, 1986 WL 19975 (Bankr. E.D.N.Y. Mar. 25, 1994) ("March 25, 1994 Order"). Union Bank cross-appeals from the March 25, 1994 Order insofar as it permitted discharge from a $130,803.44 debt owed it by Luthra. *Id.* The appeals present the Court with an issue that has yet to be addressed by the United States Court of Appeals for the Second Circuit: whether a debtor may be awarded discharge from debts dishonestly obtained solely because his creditor should have known better than to rely on his fakery.

For the reasons below, the Court answers in the negative.

## I. *BANKRUPTCY COURT FINDINGS OF FACT*

Between 1979 and 1983, Luthra, a Tanzanian national, conducted an international import/export business in the United Arab Emirates (the "UAE") under the name Eureka Sherjah ("Eureka UAE"). In April 1982, Luthra formed a New York corporation under the name Eureka General Trading, Inc. ("Eureka NY"). Eureka NY maintained a corporate bank account at Manufacturer's and Trader's Trust Company ("M & T"). Upon this account, Luthra, as president of Eureka NY, was permitted to sign checks singly, while Roland S. Alcala ("Alcala"), as vice-president, Yasmin Luthra ("Yasmin"), as Luthra's wife, and Jonathan Avirom, as Luthra's attorney, could sign checks jointly.

Eureka UAE held a corporate account at Union Bank, which was based in the UAE. By letter dated February 12, 1983, Luthra applied for various lines of credit on Eureka UAE's behalf. Union Bank denied the initial request, but, on March 14, 1983, it offered to extend credit to Eureka UAE for three months on a trial basis. On May 18, 1983, Union Bank granted Luthra's initial request and extended two lines of credit to Eureka UAE: one called local bills discounting, a type of accounts receivable financing wherein a bank permits a merchant seller to draw on a line of credit upon presentation by the seller of a buyer's post-dated check representing an actual sale of goods; the other called letters of credit, a mechanism by which a bank extends credit for the purchase of goods. Eureka UAE's total credit limit was $405,000.

Union Bank's decision to extend credit was based on Luthra's pre-existing business activity in the UAE and on six precautions taken by Union Bank. The precautions were: (1) Luthra's personal guarantee on all credit extended to Eureka UAE; (2) Luthra's pledge of all Eureka UAE accounts receivable as collateral; (3) Union Bank's reservation of the right to decline to discount particular third-party checks; (4) Luthra's agreement to assume risk of loss for dishon-

ored third-party checks; (5) Union Bank's retention of a security interest in goods purchased by Eureka UAE with letters-of-credit funds until such time as Eureka UAE reimbursed Union Bank for the funds advanced; and (6) Union Bank's retention of the right to modify or cancel the arrangement at any time, for any reason, without notice to Eureka UAE.

Meanwhile, in early April 1983, Luthra had formed Femme, Inc. ("Femme"), a second New York corporation. Although Luthra had no official connection to the corporation—Femme had one shareholder, Yasmin, and one employee, Alcala—the corporation was under Luthra's direct control. Luthra put Femme to use right away: in the following months, he applied to Union Bank on Eureka UAE's behalf for seven letters of credit in the aggregate amount of $730,-285.73, naming Femme as the beneficiary. Then, on Femme's behalf, Luthra presented Union Bank with documents reflecting sales of goods to Eureka UAE. Although the documents misrepresented the type, quantity, and value of the goods sold, Union Bank had no reason to doubt their accuracy and properly permitted Femme to cash the seven letters of credit.

During the same time period, Luthra presented to Union Bank for discounting nine checks payable to Eureka UAE at future dates. Union Bank accepted the checks and credited Eureka UKE's account in the amount of $130,803.44, the total sum of the nine checks. Not more than two weeks after the checks had been discounted, Luthra drained the Eureka UAE account at Union Bank of nearly all its funds.

After making the withdrawals, in late June 1983, Luthra and Yasmin left the UAE for the United States, with many of their household goods in tow.

On July 20, 1983, Luthra deposited the proceeds from the seven letters of credit in Femme's bank account, which was also at M & T. The next day was a busy one for Luthra: he transferred nearly all of Femme's funds to Eureka NY's M & T account; he withdrew $700,000 from the Eureka NY account and invested it in a seven-day Eurodollar note; and he opened an account for Femme at the National Bank of North America ("NBNA"). A week later, Luthra depos-

ited $980,000 in the NBNA account, an account upon which only Luthra and Yasmin had signing authority.

Neither Eureka UAE nor Luthra repaid Union Bank for the funds it advanced based on the seven letters of credit and the nine checks presented for discounting. As to the latter, although Luthra contended on at least three occasions under oath that the checks were in fact third-party checks, he admitted at trial in the bankruptcy court that the checks were in fact his own.

Union Bank brought suit against Luthra in New York State Supreme Court, Suffolk County. On December 23, 1985, that court entered judgment in the amount of $954,306.81 in favor of Union Bank. Within one month, Luthra filed a voluntary petition in bankruptcy under Chapter 7 of the United States Bankruptcy Code (the "Code"), listing personal assets in the amount of $1,910. Union Bank then commenced the adversary proceeding underlying this appeal, alleging that the debts owed it were nondischargeable, pursuant to 11 U.S.C. § 523(a)(2)(A).

## II. *PROCEDURAL BACKGROUND*

In the adversary proceeding, Union Bank alleged that Luthra's representation that the nine checks were third-party checks was a fraudulent representation because the checks were in fact his own. Union Bank also claimed that it was defrauded by Luthra when he applied for the seven letters of credit with no intention of reimbursing Union Bank for funds it might advance, and when he, through Femme, misrepresented the type, quantity, and value of the goods to be purchased by Eureka UAE under the letters of credit.

After six days of testimony, the bankruptcy court issued a decision in which it held that Union Bank's proof was insufficient to block discharge. *Union Bank of the Middle East Ltd. v. Luthra (In re Luthra)*, No. 86–0031–21 (Bankr.E.D.N.Y. Jan. 19, 1990). In its decision, the bankruptcy court indicated that Union Bank had to prove five elements: (1) that Luthra made representations to Union Bank; (2) that Luthra knew, or should have known at the time, that the representations were false; (3) that Luthra made the representations with the intent to deceive

Union Bank; (4) that Union Bank reasonably relied on the representations; and (5) that Union Bank suffered damage that was proximately caused by its reliance. Although the bankruptcy court found that Luthra had made certain representations to Union Bank on behalf of both Eureka UAE and Femme—*i.e.,* that the checks presented for discounting were third-party checks, that Eureka UAE or Luthra intended to repay Union Bank for funds advanced under the letters of credit, and that the statements regarding the goods to be purchased by Eureka UAE from Femme under the letters of credit were accurate—it determined that Union Bank failed to prove that Luthra knew, or should have known, that any of these representations were false.

On Union Bank's appeal, this Court held that Union Bank had established by sufficient proof: (1) that Luthra knew the checks he presented for discounting were not third-party checks; (2) that Luthra knew that neither he nor Eureka UAE would reimburse Union Bank for funds advanced under the letters of credit; and (3) that Luthra knew his representations as to the type, quantity, and value of the goods to be purchased from Femme were inaccurate. *See In re Union Bank of the Middle East, Ltd.,* 127 B.R. 514 (E.D.N.Y.1991). By decision dated May 22, 1991, this Court reversed and remanded for the bankruptcy court to complete the five-part test. *Id.* at 524.

On remand, with the consent of the parties, the bankruptcy court relied on the existing record and the parties' proposed findings of fact and conclusions of law. As to the nine checks presented for discounting, the bankruptcy court found that, even though Union Bank sufficiently established Luthra's fraudulent intent, it had failed to prove by a preponderance of evidence that its reliance on Luthra's representations was reasonable. *See* March 25, 1994 Order, at 22–23. Similarly, the bankruptcy court found that Luthra intended to deceive Union Bank when he applied on Eureka UAE's behalf for the seven letters of credit, but that Union Bank's reliance on Luthra's representations in the application was not reasonable. *See id.* at 24–27. However, as to Luthra's representations on Femme's behalf regarding the type, quantity, and value of the goods to be pur-

chased by Eureka UAE, the bankruptcy court found both an intent to defraud and reasonable reliance by Union Bank. *See id.* at 27–29.

Luthra appeals from the March 25, 1994 Order insofar as it denied discharge from the debt for $701,090.24 in credit extended as the result of his fraudulent representations regarding the type, quantity, and value of the goods to be purchased by Eureka UAE from Femme. Union Bank cross-appeals from the March 25, 1994 Order insofar as it permitted discharge from the debt for $130,803.44 in credit extended under local bills discounting financing.

### III. *DISCUSSION*

 A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree." Bankruptcy Rule 8013. A bankruptcy judge's findings of fact "shall not be set aside unless clearly erroneous." *Id.* The district court, however, is not bound by the bankruptcy judge's view of the law. Where the bankruptcy court has determined whether particular conduct satisfies a legal standard, the conclusion may be reviewed *de novo* by the district court. *In re Tesmetges,* 86 B.R. 21, 23 (E.D.N.Y.1988); *see* 9 Collier on Bankruptcy ¶ 8013.03. The bankruptcy court's choice of the appropriate legal standard is, of course, subject to independent review as well.

Although a principal aim of bankruptcy law is to " 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start fresh free from the obligations consequent upon business misfortunes,' " *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) (quoting *Williams v. U.S. Fidelity & Guar. Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915)), fair and even-handed treatment of the debtor's creditors should not be sacrificed in the process of providing that relief, *see Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (reducing the level of proof necessary to block discharge of debts

deceptively obtained because "Congress evidently concluded that creditors' interest in recovering full payment of debts [of this type] outweighed the debtors' interest in a complete fresh start"). The Code is filled with mechanisms for dealing with the ever-present tension between these two competing goals. For example, whereas § 727 of the Code provides the debtor filing for Chapter 7 relief with discharge of his debts, § 523 protects certain creditors by exempting categories of debt from discharge—*e.g.,* child support, alimony, and certain unpaid educational loans and taxes.

Section 523(a)(2)(A) bars discharge from debts for extension of credit "obtained by ... false pretenses, false representation, or actual fraud." [1] The provision gives creditors an opportunity to prove that particular debts arose through impermissible means, and advances the cornerstone bankruptcy principal that relief befall only the debtor with clean hands. *See Local Loan Co.,* 292 U.S. at 244, 54 S.Ct. at 699. The Supreme Court recently reduced the creditor's burden of proof under § 523(a) from clear and convincing evidence to a preponderance of evidence. *See Grogan,* 498 U.S. at 291, 111 S.Ct. at 661. Aside from putting the creditor on roughly equal footing with the debtor in dischargeability disputes, *see In re Mayer, Spanel Int'l Ltd., and Bank One–Rockford, N.A.,* 51 F.3d 670, 674 (7th Cir.1995) (interpreting *Grogan* as assuring that § 523(a) analysis "be conducted without a thumb on the scales"), the *Grogan* decision also underscored the importance of limiting the availability of "a completely unencumbered new beginning to the 'honest but unfortunate debtor.' " *Grogan,* 498 U.S. at 287, 111 S.Ct. at 659 (quoting *Local Loan Co.,* 292 U.S. at 244, 54 S.Ct. at 699).

 Courts agree that, in order to bar discharge from a debt under § 523(a)(2)(A), a creditor must prove that: (1) the debtor made a representation; (2) he knew the rep-

---

1. Section 523(a)(2)(A) reads as follows:
 (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

 . . . . .

 (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .
11 U.S.C. § 523(a)(2)(A).

resentation was false; (3) he intended to deceive the creditor; (4) the creditor relied on the representation; and (5) his reliance was the proximate cause of his damage. *See, e.g., In re Schwartz & Meyers,* 130 B.R. 416, 422 (Bankr.S.D.N.Y.1991). There is dispute, however, as to what the creditor must prove to satisfy the fourth element. One line of cases require proof that the creditor's actual reliance was reasonable. *See, e.g., In re Kirsh,* 973 F.2d 1454, 1457–61 (9th Cir.1992); *In re Burgess,* 955 F.2d 134, 140 (1st Cir. 1992); *In re Mullet,* 817 F.2d 677 (10th Cir. 1987); *In re Hunter,* 780 F.2d 1577 (11th Cir.1986); *In re Tesmetges,* 86 B.R. at 24 (E.D.N.Y.1988); *In re Wiener,* 144 B.R. 17, 20 (Bankr.E.D.N.Y.1992); *In re Wimbish,* 95 B.R. 379, 383 (Bankr.W.D.Penn.1989). A second line of cases ask for proof only as to actual reliance. *See, e.g., In re Allison,* 960 F.2d 481, 484–85 (5th Cir.1992); *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987); *In re Sobel,* 37 B.R. 780, 785–86 (Bankr. E.D.N.Y.1984) (in dicta). Still another line of cases impose a hybrid requirement. *See, e.g., In re Mayer,* 51 F.3d at 676 (requiring proof that the debtor's misrepresentation was material and actually relied upon); *In re Phillips,* 804 F.2d 930, 933 (6th Cir.1986) (instructing that the creditor need not prove that his reliance was reasonable, but indicating that discharge will be granted where the creditor relied "in bad faith"). As indicated above, the Second Circuit has not taken a position.

Courts incorporating reasonable reliance into the § 523(a)(2)(A) mix have presented little by way of justification. The silence is not surprising; beginning with the statutory language, the expediency of such a requirement is dubious. Whereas § 523(a)(2)(B) [2] bars discharge from debts obtained by written statement respecting the debtor's financial condition if, and only if, the creditor's reliance on the statements was reasonable,

the language of § 523(a)(2)(A), which addresses oral and other written representations by the debtor, establishes no such requirement. The distinction makes sense—*i.e.,* lending institutions should be held to a higher standard of reliance for representations made in instruments typically at the foundation of a credit application than for oral and supplemental written representations, which are generally less vital to the process and more difficult to substantiate. Whatever its rationale, the fact remains: Congress wrote a reasonable reliance requirement into § 523(a)(2)(B), and not into § 523(a)(2)(A).

Where courts have called for a showing of reasonable reliance under § 523(a)(2)(A), it has been at times a toothless requirement. In *In re Wimbish,* 95 B.R. 379 (Bankr. W.D.Penn.1989), the debtor applied for and received from his employer's credit union a $3,800 personal loan. On the portion of the application asking the applicant to set forth the purpose for which the loan was sought, the debtor indicated, "home improvements." Evidence at the hearing on discharge, however, indicated that the debtor actually used the loan proceeds to cure arrearage on the home's mortgage—a last-gasp attempt to forestall imminent foreclosure. Given that the credit union had a policy against extending personal loans to be used solely for satisfying preexisting debt, the court determined that the debtor had intentionally deceived the credit union and denied discharge from the debt under § 523(a)(2)(A). The credit union had proved that its reliance was reasonable, according to the court, because one of its employees testified that "there was no reason to doubt the veracity of the purpose stated by the Debtor." *Id.* at 384. Had the credit union performed a credit check, as its head teller testified it usually does in considering personal loan approvals, doubt certainly would have emerged as to the debtor's

**2.** Section 523(a)(2)(B) reads as follows:
(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive....
11 U.S.C. § 523(a)(2)(B).

stated purpose. The court was troubled by the debtor's conduct—the lies he told to obtain credit—so troubled that it barred discharge even though the credit union relied without taking its usual precautions.

A creditor's carelessness can be easy to overlook. A court does not reach the fourth prong of the discharge analysis unless it has already determined that the debtor deliberately duped his creditor. Excusing the debt at that point, solely because the creditor lacked the sophistication, skepticism, or savvy to uncover the fraud, does not square with the bankruptcy policy of providing a "fresh start" only to those who deserve it. Honesty is the threshold requirement for discharge. A debt obtained by dishonest means should be exempted from discharge, pursuant to § 523(a)(2)(A), unless the creditor actually disregarded facts that would have alerted him to the truth or has himself acted in bad faith. *See In re Mayer,* 51 F.3d at 676. Mere failure by the creditor to conduct a more thorough investigation, however, does not without more provide a sufficient basis to foreclose § 523(a)(2)(A) relief. *See id.*

Jatinder Kumar Luthra was not honest— not in conducting his businesses; not in testifying under oath. The bankruptcy court found, *inter alia:* that he misrepresented the nature of the checks he presented to Union Bank for discounting; that he applied for and received funds from Union Bank that he never intended to repay; that he organized a sham transaction between two of his companies—one of which he operated secretly—to advance a plan to defraud Union Bank of nearly $1 million. Union Bank was not his only victim.[3] He tried to escape responsibility by fleeing the UAE and shuffling bilked funds from account to account around the globe. And when the gig was up—when a New York state court entered a fraud judgment against him—he filed for bankruptcy.

During the bankruptcy proceedings, he lied under oath.

■ Nevertheless, the bankruptcy court awarded Luthra with a discharge from the $130,803.44 debt for credit extended under the local bills discounting financing. The bankruptcy court determined that because there was no evidence to show that Union Bank followed even its internal procedures for obtaining the "rudimentary information" necessary to gain "some indication as to whether the checks were the fruit of a legitimate transaction," Union Bank could not be said to have relied reasonably on Luthra's representation that he was presenting third-party checks. *See* March 25, 1994 Order, at 21–22. Moreover, as the bankruptcy court noted, Union Bank's reservation of the right to reject any particular third-party check was a tacit acknowledgement that it planned to undertake some investigation. *Id.* at 22. Indeed, Union Bank should have exercised more care. In a § 523(a)(2)(A) case, however, the Court must focus on the means by which the debtor obtained the funds. Where, as here, the debtor lied to obtain funds and that lie was actually relied upon by a creditor who did not blatantly disregard facts that would have alerted him to the truth, the debtor is not entitled to a discharge. The Court, therefore, reverses the bankruptcy court's decision insofar as it permitted discharge of Luthra's $130,803.44 debt.

The bankruptcy court did find, however, that Union Bank actually relied on Luthra's representation that he was presenting third-party checks. This Court agrees with that determination. There being no indication that Union Bank could have uncovered the fraud without additional investigation, this Court holds that, as a matter of law, Union Bank met its burden of proof as to the fourth element under § 523(a)(2)(A). With reliance established, the Court also holds that, as a matter of law, the record sufficiently supports a conclusion that Union Bank's reliance

---

**3.** As this Court noted in its first decision in this case, *see In re Union Bank,* 127 B.R. at 522 n. 3, *Luthra* directed schemes against other banks as well. For example, before he departed the UAE, Luthra applied for and was issued a letter of credit for $175,000 from Algemene Bank Nederland NV ("ABN") in favor of Femme. *Id.* Soon thereafter, ABN sued Luthra in New York Supreme Court, alleging that Luthra fraudulently obtained $340,000 in credit. *Id.* That court issued an order of attachment, which it released after Luthra paid $180,000 to ABN (out of a briefcase filled with $100 bills) and signed an agreement to repay the balance in the future, even though he " 'presently had no assets.' " *Id.* Luthra neglected to mention that he had recently transferred $1,017,355.55 into Yasmin's account at NBNA. *Id.* After ABN learned of the NBNA account and asked NBNA to freeze it, Luthra repaid ABN in full. *Id.*

**94**

was the proximate cause of its damage. The elements of § 523(a)(2)(A) having been sufficiently established, Luthra is not entitled to discharge from the $130,803.44 debt.

As to the $701,090.24 debt for funds advanced under the letters of credit, the bankruptcy court denied discharge, finding: that Luthra misrepresented the type, quantity, and value of the goods to be purchased by Eureka UAE from Femme; that he did so with the intent to deceive Union Bank; that Union Bank's reliance on the representations was reasonable; and that its reliance was the proximate cause of its damage. This Court affirms this part of the bankruptcy court's decision.

## IV. CONCLUSION

For the above reasons, the decision of bankruptcy court is affirmed in part, reversed in part, and the case is remanded with instructions to enter judgment consistent with this memorandum and order.

SO ORDERED.

## JUDGMENT

May 26, 1995

A Memorandum and Order of Hon. Leonard D. Wexler, having been filed on May 24, 1995, affirming in part, reversing in part, the decision of U.S. Bankruptcy Judge Holland, dated March 25, 1994, declaring a $701,090.24 debt owed by Appellant–Cross Appellee, JATINDER KUMAR LUTHRA to Appellee–Cross Appellant, UNION BANK OF THE MIDDLE EAST, LTD., nondischargeable, and declaring a $130,803.44 debt owed by Appellant–Cross Appellee, JATINDER KUMAR LUTHRA to Appellee–Cross Appellant, UNION BANK OF THE MIDDLE EAST, LTD., dischargeable, and remanding this case with instructions to enter judgment consistent with this Court's memorandum and order, it is

ORDERED and ADJUDGED that the decision of the Bankruptcy Court declaring the $701,090.24 debt nondischargeable is affirmed; that the decision of the Bankruptcy Court discharging the $130,803.44 debt is reversed; and that the case is remanded with instructions to enter judgment consistent with this Court's memorandum and order.