**In re SCHWARTZ & MEYERS,**
**William Meyers and Joseph**
**J. Schwartz, Debtors.**

**Harriet SMITH, Plaintiff,**

**v.**

**William MEYERS, Defendant.**

**Harriet SMITH, Plaintiff,**

**v.**

**Joseph J. SCHWARTZ, Defendant.**

**Bankruptcy No. 84 B 11306–8(TLB).**
**Adv. Nos. 85–6821A (TLB),**
**85–6820A (TLB).**

United States Bankruptcy Court,
S.D. New York.

Aug. 7, 1991.

Wachtell, Lipton, Rosen & Katz, New York City by Scott A. Edelman, for Harriet Smith.

Haight, Gardner, Poor & Havens, New York City by Jon Yard Arnason, Christopher G. Kelly, for William Meyers.

White & Case, New York City by Beth Haroules, James Laughlin, Robert DePippo, for Joseph Schwartz.

## DECISION ON DISCHARGEABILITY

TINA L. BROZMAN, Bankruptcy Judge.

Each of us is prone, at one time or another, to foist blame on others for our own mistaken judgments. When bankruptcy ensues, that is a particular temptation for people left with unsatisfied debts. In these consolidated adversary proceedings,[1] a creditor seeks to declare nondischargeable some $99,000 in debt as against two partners of a partnership with whom she invested her life's savings on the advice of a friend and romantic interest. Although the loss of a good portion of her money was a personal tragedy, it is not one for which the partners ought be held forever responsible.

### The Plaintiff

Harriet Smith is a 54 year old woman, divorced some 15 years ago. Towards the end of her twenty-year marriage, and continuing thereafter, she was employed as a research technician at a local hospital. As time went on, she developed an interest in economics and attended some lectures and classes. She even assisted an author to gather material for a book on banking. Unsophisticated about financial matters during the course of her marriage, she increased her business acumen steadily after her divorce. Throughout the course of the trial she painted herself as a financial naive, yet her relative prowess was revealed when she testified that she had told Martin Rosenblatt, the romantic interest who figures so prominently in this story, that she did not want to be supplying "venture capital."

### Her Friends

Smith met Rosenblatt some twenty years ago. They were neighbors whose children were friends. The two divorced their spouses at roughly the same time and Rosenblatt began living with Smith's close friend. The friendships blossomed. In 1977, Smith asked this friend whether she knew someone knowledgeable about investments. Rosenblatt was proffered. Trained as a social worker, he was moonlighting as a salesman at an insurance company. When Smith asked in what manner she ought invest her funds, he purchased from his employer an annuity for her, for which, as she knew at the time, he earned a commission.

After ending his relationship with Smith's friend, Rosenblatt dated Smith. Their social contacts were frequent. During one of his visits in 1979 he mentioned that he was becoming a salesman for a real estate company, where he would earn more money than previously. Smith testified that he called the company "Schwartz & Meyers," but Rosenblatt testified that he had technically worked for "Harrow Management."

### The Partnership

Schwartz & Meyers was a partnership of three lawyers founded in 1952 whose business was real estate and related ventures. The partners were Joseph Schwartz, William Meyers and the late Louis Harrow. The same three were partners in Harrow Management, a real estate brokerage and management firm which worked with Schwartz & Meyers.

The Schwartz & Meyers partnership was successful for over 30 years. It borrowed money on a short-term, unsecured basis from a number of individuals, principally family members and friends, but also a few sophisticated, knowledgeable investors, including the partnership's accountant of over ten years as well as a Nobel laureate economist. The terms of each loan included the partnership's promise to pay interest at an attractive, above-market rate, and to repay the loan upon 30 days' demand. The partnership used the proceeds of such loans to invest in various real estate and other ventures. Although Smith has alleged that these ventures were risky, that assertion was disputed by every person with knowledge of the quality and extent of the investments, each of whom testified that the investments were on the whole conservative.

---

**1.** All of the counsel in these two adversary proceedings were *pro bono.* I wish to thank them for their energetic and professional presentations.

The partnership's record in paying interest and repaying loans on demand was unblemished for a period of over 30 years. No loan or interest payment was ever missed until late summer, 1984, when, upon the advice of lawyers, the partnership ceased such payments following Harrow's death and a demand for liquidation by his estate.

### Her Investment

Having announced to Smith that he was becoming a salesman, Rosenblatt immediately started to interest her in investing in Schwartz & Meyers. In Smith's words, he described the partners as "very wealthy;" "very altruistic"; "very conservative." Further, she testified Rosenblatt told her that "they have acquired a lot of real estate assets through the years." She admitted that Rosenblatt "didn't tell me much about their investment," including how many properties Schwartz & Meyers owned, although he did mention that the partnership had owned property in New York and its environs and that it owned property in different locales. What he was more specific about was his opinion that this type of investment was more liquid than her annuity because, over the years, Schwartz & Meyers had paid one percent interest per month to its investors and had agreed to repay any loan within 30 days of the investor's request. He also described as "conservative" an investment with Schwartz & Meyers.

Each and every factual statement uttered by Rosenblatt was true when made. Indeed, at the same time Rosenblatt was advising Smith and others to loan money to the partnership, he was himself lending it money, as was his family, and he continued to do so until he left Harrow Management's employ in 1983.

Without more, Smith decided to make her first investment with Schwartz & Meyers, sending the partnership, via Rosenblatt, $17,000. She was well aware that Rosenblatt was earning a commission for securing her investment. Between February 1979 and July 1984, Smith made sixteen more investments (including reinvestment of interest) for an aggregate of almost $100,000. She received no information whatsoever (other than confirmation of her investments from Schwartz & Meyers which she did not begin to receive, in any event, until about a year after she made her first investment), yet blindly entrusted to Rosenblatt the investment of her money.[2] Throughout the five and one-half years that she continued to send money to the partnership, Smith received interest payments, many of which she reinvested with Schwartz & Meyers.

### Her Decisions

Smith steadfastly maintains that she did not call her loans, and lent additional money, because she was led to believe that her investment was risk free. But her own testimony belies her assertion.

On not one, but two, occasions she asked worldly friends about the wisdom of investing with Schwartz & Meyers. In the face of two opinions questioning whether this type of investment was appropriate for her, she determined to leave her money where it was and to add additional money to the fund. It appears that the motivating factor was her rate of return.

The first friend, a Mr. Armando Pico, advised Smith in 1981 that a certificate of deposit would be a better and safer investment. That Smith understood the import of this advice was certain for she testified that she afterwards expressed to Rosenblatt her concern "that because the interest rates were higher, that people would be withdrawing money from Schwartz and [sic] Meyers and also placing them in the banks, which would make that investment [with Schwartz & Meyers] not so good." Upon Rosenblatt's representation that she would earn a higher interest rate, which, in fact, she and the other investors actually received, she left her money with the partnership.

---

**2.** If applicable law imposed a disclosure requirement on Schwartz & Meyers in conjunction with investments in the partnership, a matter which was neither argued nor briefed, nothing in this opinion is intended to absolve the partnership or its partners from any such requirement.

About a year later she sought advice from Joseph Budish, the author of the book on banking whom she was assisting. Budish, Smith testified, was worried about banks and counseled her to purchase treasury bonds or bills. He specifically characterized as "risky" investments in real estate and offered to meet with Rosenblatt to discuss Smith's investment. Smith did not attend that meeting. Even though, according to Smith, Budish was "still not happy" after meeting with Rosenblatt and continued to advise her to withdraw her money, Smith decided to leave it with the partnership. Smith testified that Rosenblatt disagreed with the notion that real estate investments were risky, but Smith had received contrary advice from two friends and she knew that Rosenblatt stood to gain financially from her investment.[3] In short, she freely chose to disregard the advice of Pico and Budish in favor of a higher rate of return. Never prior to July, 1984 did Smith demand a return of all or any portion of her funds nor did she demonstrate that, had she made such a demand, it could not have been fulfilled.

*The Partnership's Assets*

In the late 1970s, when Smith began investing, Schwartz & Meyers had a variety of real estate assets. It had acquired in 1979 a shopping center in White Plains, New York and owned property in Pawling, New York from which it was hoped income would be generated. And through a network of subsidiary corporations and partnerships (the Affiliates), it had acquired undeveloped real estate in West Virginia and South Carolina. The Affiliates, using funds borrowed from the partnership and generated from sales, kept developing the property, putting in roads and building homes. The intent was to sub-divide the land, build one-family homes, and sell them. The Affiliates took back purchase money mortgages on the homes, charging a modest interest rate on the financed portions of the purchase price.

The rate of interest on the purchase money mortgages was always less than the rate which Schwartz & Meyers was paying its investors. Nonetheless, because the dollars generated by the interest received on the mortgages exceeded the dollars owed as interest to the investors, the unrebutted testimony established that on a cash flow basis, the South Carolina and West Virginia projects were sound. In addition, the Affiliates realized substantial gains when the acreage was sold.

The partnership's accountant, Seymour Schwartz, who is unrelated to Joseph Schwartz, pointed out to Messrs. Schwartz and Meyers the apparent interest anomaly. But so satisfied was he with the cash flow that he became an investor himself. He testified that the South Carolina properties, most of which were sold, were always profitable, even after bankruptcy, and that the West Virginia properties, virtually all of which were sold, were profitable until a downturn in the coal industry which led to foreclosure of many of the Affiliates' mortgages. As a result, the partnership was left as owner of significant property whose market value had indisputably fallen. But, the accountant further testified, the West Virginia holdings constituted only 25% of the partnership's assets and the diminution in return was offset by the profitability of the South Carolina properties.

Concededly, the partnership did not reflect the South Carolina and West Virginia operations as profitable on its tax returns. But the accountant testified, without contradiction, that this was because of specified accounting and tax conventions and that the properties were profitable for all of the periods at issue, with the exception, described above, relating to the West Virginia property. During the period of time when Smith was sending money to or reinvesting her interest payments in the partnership, he testified, the partnership was as a whole profitable on a cash basis.

In 1981, the partnership, with others, created Teleculture, Inc. (Teleculture) to devel-

---

3. Smith made some reference to a "guarantee" which she received from Rosenblatt personally at this time. Apparently the guarantee was oral, for she never produced any written guarantee. What its terms were are not clear from the record.

op and market foreign television and film products in the United States. At trial, Harriet Smith deemed it "risky;" Joseph Schwartz described it as "one of the best investments I had ever seen." Teleculture acquired from various German television stations a right to all the programs they would broadcast for 30 years and a right of first refusal on all the current television programs and films at a price that was described by Schwartz as a tiny fraction of production cost. The accountant confirmed that his projections for Teleculture were favorable.

*The Partnership's Demise*

The partnership's demise occurred when the Harrow estate sought a distribution of the partnership's assets and Harrow's friends and family sought a return of their investments. On counsel's advice, Schwartz & Meyers stopped all payments of principal and interest. There followed fairly quickly involuntary bankruptcy filings against Schwartz & Meyers and the two surviving partners. The debtors converted their cases to reorganization cases under chapter 11 of the Bankruptcy Code. The cases proved unsuccessful and were reconverted, on consent of the debtors, to chapter 7, where they have been administered by a trustee.

*Her Theory*

Smith has urged that the partnership had no source of funds with which to pay interest or repay principal except new loans from new investors. Every person with knowledge of the partnership's financial affairs disputed this contention, testifying that the cash to repay withdrawing investments came from a variety of sources, including "new" loans, reinvestment of interest, interest income from mortgages given on property in West Virginia and South Carolina, and capital gains realized on sales of portions of such properties.

Smith alleges that Rosenblatt, as agent for Schwartz & Meyers, made the following statements to induce her to invest in the partnership: Smith's investment would, in effect, be like an annuity and would be "as safe as in a bank"; the partnership made only stable, conservative investments and was not involved in speculative ventures; Smith would receive a fixed rate of return on her money; her investment would be completely liquid and fully returnable upon thirty days' notice; and the partnership had a large and diverse portfolio of profitable real estate, located in different parts of the United States, including several in New York City and its environs.

Arguing that these statements were false and misleading, Smith asks that the debt owed her be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2) (1979 & Supp.1990) (the Code). In the alternative, Smith posits that because the representations concerning the liquidity and return of her investment were statements of financial condition and reduced to writing, § 523(a)(2)(B) of the Code also provides grounds for the relief she seeks. Assuming without deciding that Rosenblatt was, as Smith contends, an agent of the partnership,[4] I find that Smith cannot prevail under either Code section and that the debt is dischargeable.

DISCUSSION

■ Several oft-encountered benchmarks guide any discussion of dischargeability. To afford the economic "fresh start" that is bankruptcy's goal, exceptions to discharge must be literally and strictly construed against the creditor and liberally in favor of the honest debtor. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Household Finance Corp. v. Danns (In re Danns),* 558 F.2d 114, 116 (2d Cir.1977); *Gafni v. Barton (In re Barton),* 465 F.Supp. 918, 921 (S.D.N.Y.1979); *Schwalbe v. Gans (In re*

---

4. A great deal of the trial was addressed to whether Schwartz & Meyers was soliciting, through Rosenblatt, investments in the partnership. In support of her agency theory, Smith points to the guilty pleas entered by both men to misdemeanors under the Martin Act for failure to make certain disclosures in connection with sales to other investors. Because of the assumption I have made regarding Rosenblatt's agency and because of his undisputed solicitation of Smith's investments, among other reasons, the probative value of the guilty pleas on this issue is rendered moot.

*Gans),* 75 B.R. 474, 480–81 (Bankr. S.D.N.Y.1987). The burden is on the creditor to prove by a preponderance of the evidence that each of the elements under § 523(a) has been met. *Grogan v. Garner,* — U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Gans,* 75 B.R. at 482 (citing cases); *Seepes v. Schwartz (In re Schwartz),* 45 B.R. 354, 357 (S.D.N.Y.1985); *In re Cerrato,* 31 B.R. 444, 448 (Bankr. S.D.N.Y.1983).

Under § 523(a)(2)(A), a debt will not be discharged to the extent that the money at issue was obtained by "false pretenses, false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient. 3 L. King, *Collier on Bankruptcy,* ¶ 523.08 at 523–45 (15th ed. 1990). Historically, the five elements a creditor must establish to prevail under this section of the Code include:

(1) the debtor made representations;

(2) the debtor knew the representations were false at the time they were made;

(3) the representations were made with the intent to deceive the creditor;

(4) the creditor relied on the representations;

(5) the creditor was injured by the representations and suffered damages as a result.

*See Hong Kong Deposit and Guaranty Co. v. Shaheen (In re Shaheen),* 111 B.R. 48, 51 (S.D.N.Y.1990), *citing, inter alia, Mechanics and Farmers Savings Bank v. Fosco (In re Fosco),* 14 B.R. 918, 920 (Bankr.D.Conn.1981); *In re Union Bank of the Middle East, Ltd.,* 127 B.R. 514, 517–18 (E.D.N.Y.1991). Failure to prove any one of these elements is fatal to a creditor's case. *In re Gans,* 75 B.R. at 483.

With these principles in mind, I turn to the first representation alleged to have been made, that Smith's investment would be "as safe as in a bank." Rosenblatt, the purported declarant, unequivocally denied having made the statement and his testimony on this point remained unshaken. He candidly suggested that he was in fact an agent for Schwartz & Meyers and admitted to making several of the other statements upon which Smith relies. Nothing I observed during the course of the trial gave me reason to doubt that Rosenblatt was testifying truthfully and to the best of his knowledge.

Smith, on the other hand, was a far less credible witness. Not only did she feign fiscal naivete, but her testimony was at times uncertain and inconsistent with other statements made under oath. For example, in describing a conversation she had with Rosenblatt over the prudence of keeping her money in the partnership or investing in a bank certificate of deposit, at trial Smith could not recall exactly what was said to her, only that it was "something about the banks." During another line of questioning, Smith admitted that she "didn't remember the exact words" used by Rosenblatt when he first approached her about investing in the partnership and that she "didn't want to get caught up in words, because [she didn't] remember" exactly whether Rosenblatt used the term "loan" to describe her advance to the partnership. At other points Smith had difficulty reconciling her trial testimony (in which she admitted having conversations with defendant Schwartz over the telephone) with that given at a pretrial deposition (when she testified she had never spoken with him). Smith's explanation for the inconsistency was that "there was an awful lot to remember" and that "[she] was sure [she] forgot a lot." These memory lapses, taken together with Smith's admitted bitterness towards Rosenblatt over her participation in the partnership, cast doubt on her recollection of the precise language used at the outset of her investment.[5] I

---

**5.** At trial, Smith attempted to introduce, and the defendants objected to, the testimony of Judy

Apello, another investor and romantic interest of Rosenblatt who claims that she was also told

make these credibility findings carefully and deliberately, as I recognize the importance they play in dischargeability actions and the deference to which they are entitled on appeal. *See In re Shaheen*, 111 B.R. at 52.

Even had Smith established that the "safe as in a bank" analogy was made, the statement would not warrant a denial of discharge under § 523(a)(2)(A). To be actionable, the representation must be one of existing fact and not merely an expression of opinion, expectation or declaration of intention. *See Rowe v. Showalter (In re Showalter)*, 86 B.R. 877, 880 (Bankr. W.D.Va.1988); *Barnes v. Pallo (In re Pallo)*, 65 B.R. 101, 104 (Bankr.W.D.Ky.1986); *Lisk v. Criswell (In re Criswell)*, 52 B.R. 184, 197 (Bankr.E.D.Va.1985). Also falling within the purview of nonactionable language are those statements which amount to no more than sales "puffery" upon which reliance should not be placed. *See Joseph v. Stone (In re Stone)*, 91 B.R. 589, 592 (D.Utah 1988); *Harper v. Richey (In re Richey)*, 103 B.R. 25, 30 (Bankr.D.Conn. 1989); *Stahl v. Lang (In re Lang)*, 108 B.R. 586, 589 (Bankr.N.D.Ohio 1989); *Hansen v. Drayman (In re Drayman)*, 77 B.R. 773, 776 (Bankr.C.D.Ca.1987); *Selz v. Snyder (In re Snyder)*, 62 B.R. 182, 183–84 (Bankr.M.D.Fla.1986). It is only when the declarant does not hold these opinions or utters them with reckless indifference for their truth that the requisite fraud can be found. *See In re Shaheen*, 111 B.R. at 53; *In re Richey*, 103 B.R. at 30, *citing Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985).

Rosenblatt's purported analogy is similar to the nonactionable puffery found in other decisions where complaints objecting to discharge were dismissed. For example, in *In re Drayman*, the creditors based their cases almost entirely on the allegation that the debtor misrepresented the safety of their investment in a real estate limited partnership. The court, assuming that the debtor did "guarantee" the creditors' investments, found that the alleged statement was not made with reckless disregard for the truth where: the debtor seemed confident that each project could be developed and planned as sold; the debtor testified he had a successful track record in past ventures; and the inability to finance and the ultimate failure of the developments at issue were caused by a recessionary downturn which the debtor could not have predicted. 77 B.R. at 776. In *In re Snyder*, the debtor advertised to his customers that the only way to beat inflation was to invest in the precious metals he was selling, an advertisement which included his prediction as to how well the investment would do and an offer to repurchase the merchandise at 10% to 20% more than that paid by the customer. The *Snyder* court found nothing in the record to indicate that the debtor made these predictions knowing they would never happen and discharged the debts, notwithstanding the fact that, in at least one instance, the debtor was unable to make good on his repurchase offer. 62 B.R. at 183–84. *See also, In re Lang*, 108 B.R. at 589 (debtor's alleged statements that investment was "risk free" were mere puffery and not actionable); *In re Stone*, 91 B.R. at 592 (no cause of action found in debtor's purported claim that investment would "double or triple in value" in the future).

The bank comparison, if made, Rosenblatt's admitted statements that the partnership made only "stable, conservative investments" and his comments regarding the liquidity and rate of return which Smith could expect, were all no more than mere expressions of Rosenblatt's opinion or a declaration of how he felt Smith's investment would perform in the future. Smith has failed to establish that Rosenblatt did not hold these opinions; indeed, the undisputed evidence in the record is to the contrary. Rosenblatt himself invested money in the partnership which he did not withdraw and encouraged his family and

---

her that an investment in the partnership was as safe, if not safer, than a bank. Because I find that the comparison to the bank, even if made, is not actionable, I need not resolve the dispute over the admissibility of Apello's testimony, testimony which, in any event, was shown to be wildly exaggerated, if not untrue.

friends to do the same, which I find to be objective indicia of his belief in the statements that he made. Moreover, Smith has not refuted the Debtors' assertion that for thirty years the partnership investors were paid the promised rate of return and were able to withdraw their investments on thirty days' notice. Smith concedes that prior to March 1, 1980 the partnership paid interest on her investment until she elected to accrue her dividends rather than receive a cash payment. She admits that prior to the bankruptcy she never demanded the return of her money and she has not established that if such demand had been made, the partnership would have been unable to make the refund within the agreed upon thirty days.[6] Thus, even if these statements might otherwise rise to the level of actionable representations, Smith has failed to establish that Rosenblatt knew the statements were false at the time they were made or that they were made with the intention to deceive her. *See, e.g., In re Stone*, 91 B.R. at 592 (falsity of statement not established when, at least for a while, investment increased in value as debtor claimed it would); *Kovitz v. Tesmetges (In re Tesmetges)*, 74 B.R. 911, 916 (Bankr. E.D.N.Y.1987), *aff'd*, 86 B.R. 21 (E.D.N.Y.1988) (lack of intent to defraud not proven when for 18 months, debtor made interest payments as promised); *Meat Requirements Coordination v. Salett (In re Salett)*, 53 B.R. 925, 928 (Bankr. D.Mass.1985) (where debtor continues to make payments as agreed up until final purchase, creditor could not establish fraudulent intent).

The final statements relied upon by Smith concern the type of investments with which the partnership was involved. Smith asserts that, in inducing her to invest, Rosenblatt represented that the partnership maintained a large and diverse portfolio of real estate, and in particular, that it owned properties in New York City and its environs. She claims these statements were false because the partnership holdings were not diverse but limited to real estate located in West Virginia and South Carolina and that it held no investments "whatsoever" in New York City. Moreover, Smith argues these statements were fraudulent because in 1981 the partnership also began marketing foreign films through Teleculture, notwithstanding Smith's apparent belief that her money would be used to invest exclusively in real estate. Once again, Smith has failed to carry the burden allotted her in proving these statements warrant denial of discharge.

Rosenblatt's characterizations of the size of the real estate holdings can be viewed as his personal, nonactionable opinion of the scope of the partnership's portfolio. Rosenblatt testified that at the time he began soliciting investors, he understood that the partnership owned thousands of acres of property in West Virginia and South Carolina that were to be developed and ulti-

---

**6.** In an attempt to establish that the partnership could not repay her investment within thirty days, Smith introduced into evidence the state court guilty pleas entered by Schwartz and Meyers. Meyers admitted that in 1984, the partnership was insolvent, that it had more debts than cash and that money obtained from the investors was being used to pay existing investors. Schwartz admitted only that the financial condition of the partnership had not been disclosed to certain investors in 1984. See footnote 4, supra. These pleas do not support Smith's intended proposition as they establish no more than that the partnership would be unable to make good if all investors had demanded the return of their money at the same time. Indeed, the pleas are entirely consistent with Meyers' trial testimony; he forthrightly admitted that the partnership was not sufficiently liquid to satisfy a "run" by all its investors and that the funds used to pay existing investors and other expenses of the partnership came from, among a number of other sources, new investments. Nothing in the record suggests, however, that if Smith had made a demand for her money the partnership would have been unable to comply. Moreover, the admissions contained in the pleas were limited to 1984 and are largely irrelevant to this case, as Smith made only one investment (exclusive of accrued interest) during that time period. Finally, at the time the pleas were entered, Meyers was 74 years old and Schwartz, 68. Both were in dire financial straits and Schwartz was suffering from Parkinson's disease. As they testified at trial, neither had the stomach to put himself or his family through the criminal proceedings, particularly in light of the very favorable plea bargains (which were limited to misdemeanor violations and did not involve incarceration) that were offered.

mately would generate a source of revenue from which investors would be paid. Smith has offered nothing to establish that Rosenblatt did not believe what he said or was reckless in choosing the terms he did in describing the partnership holdings to her.

Similarly, Smith has not established that a cause of action arises from Rosenblatt's statement regarding the New York City situs of the holdings. At trial, Rosenblatt explained that he understood that since the 1950s Schwartz, Meyers and Harrow were successful businessmen in the real estate field who obtained capital to finance their investments by syndicating ownership in a number of buildings located in New York City. He also testified that the three men were involved in a number of other businesses, such as garment and book shops and that through these various ventures the partners had accumulated vast amounts of wealth over the years. Rosenblatt testified that he relayed his understanding of the partnerships' history to Smith at the time they first discussed switching her money from the annuity. As for his role in attracting new capital, Rosenblatt testified that he was to market the thousands of acres of property that the partnership held in West Virginia and South Carolina.

Smith testified that Rosenblatt represented to her that through the previous thirty years, the partnership accumulated a lot of real estate in "New York City ... and its surrounding area ..." which it was "pretty well sitting on [and] acquiring wealth from the buildings." She maintains that it was misrepresented to her that the New York properties were assets still owned by the partnership which would continue generating income in the future. For two reasons, Smith's argument must fail. First, given Rosenblatt's uncontradicted testimony regarding the White Plains shopping center, Smith has failed to establish her claim that the partnership owned no property whatsoever in New York City or its environs. Other unrefuted testimony established that the partnership also owned property during the years 1979–84 in Pawling, New York. Second, the record can be read to suggest that Rosenblatt referred to the New York City and environs holdings in the past tense (from which wealth was accumulated) or just as easily that there was a miscommunication, with Smith believing the comments referred to assets presently owned by the partnership. In such an instance and in light of the burden placed upon the creditor, an objection to discharge cannot succeed. *See Perrine v. Bettman (In re Bettman)*, 102 B.R. 300, 303 (Bankr.E.D.N.Y.1989) (complaint dismissed when conversations relied on by creditor equally consistent with position urged by debtor); *Chase Manhattan Bank v. Fordyce (In re Fordyce)*, 56 B.R. 102, 105 (Bankr.M.D.Fla.1985) (same); *Capital Insur. Agency v. Carneal (In re Carneal)*, 33 B.R. 922, 925 (Bankr.E.D.Va.1983) (at worst, purported representation was misunderstanding between parties; if it was something more, creditor failed to carry burden).

Nor has Smith established that the partnership's purportedly undisclosed investment in Teleculture warrants that her debt be declared nondischargeable. "Where a debtor acquires certain monies with the condition that they are to be used only for restricted purposes and the debtor has no intention to abide by such restrictions, 'then a misrepresentation clearly exists upon which a debt can be properly held non-dischargeable.'" *In re Gans*, 75 B.R. at 483, *quoting among others, Cass v. Jones (In re Jones)*, 50 B.R. 911, 921 (Bankr.N.D.Tex.1985). Conversely, as in *Gans*, where it is unclear from the record that the debtor represented to the creditor that her money would be used for any restricted purposes, the underlying debt is subject to discharge. 75 B.R. at 483. *Compare, Kartchner v. Kudla (In re Kudla)*, 105 B.R. 985, 990 (Bankr.D.Colo.1989) (debtor received funds on representation that money was to be held in escrow when in fact he was using trust funds for personal expenses). Smith has not alleged that Rosenblatt or anyone else ever represented to her that her money would be invested exclusively in real estate.

■ More importantly, the statements regarding the New York properties and the alleged omissions concerning Teleculture are not actionable because Smith has failed to establish that she relied on them at the time she invested her money. There is a split of authority over whether the reliance under § 523(a)(2)(A) must be "reasonable" as expressly required under § 523(a)(2)(B). Some courts impose the reasonableness requirement notwithstanding its absence in the statutory wording of § 523(a)(2)(A). *See, e.g., First Bank v. Mullet (In re Mullet)*, 817 F.2d 677 (10th Cir.1987); *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577 (11th Cir.1986); *Cooke v. Howarter (In re Howarter)*, 114 B.R. 682 (9th Cir. BAP 1990). Other courts hold that a creditor need only show that he relied on a debtor's fraudulent representations in order to have a debt declared non-dischargeable. *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340 (8th Cir.1987); *Rowe v. Showalter (In re Showalter)*, 86 B.R. 877 (Bankr.W.D.Va.1988); *accord, Montalto v. Florence N. Sobel, Inc. (In re Sobel)*, 37 B.R. 780 (Bankr. E.D.N.Y.1984) (dicta). A third line of cases presents something of a hybrid, holding that while actual reliance is enough, that reliance cannot be so unreasonable as to be no reliance at all. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 933 (6th Cir. 1986) *citing among others, Northern Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981) (Act case); *Mechanics and Farmers Savings Bank v. Fosco (In re Fosco)*, 14 B.R. 918, 923 (Bankr.D.Conn.1981). Regardless of the standard imposed, each of these authorities requires at a minimum that the creditor prove actual reliance on the representations, a showing Smith has failed to make in the case before me.

That Smith relied not on what Rosenblatt told her regarding the type of investments, but on her feelings for Rosenblatt, is evidenced by Smith's own testimony. Smith testified that from the time Rosenblatt first approached her, she was skeptical about the partnership and uninterested in the reputation of Schwartz & Meyers or what their business had been for the prior thirty years. Instead, she claims to have insisted on knowing "exactly what [the partnership] had" at the time she was to invest. Smith acknowledged that notwithstanding her insistence, Rosenblatt did not say much about the investments nor did he enumerate the exact location or quantity of the properties held by the partnership. Nonetheless, Smith decided to invest to "give it a chance", in large part because Rosenblatt promised that he would personally watch over her money as he had done with her earlier purchase of an annuity. She asserted that she continued to demand "papers" from Rosenblatt. Yet the only documents Smith received were letters confirming receipt of her several investments. In fact, two years after her initial investment and at the time she was considering withdrawing her money and investing in treasury bills, Smith conceded that she "still [didn't] know what [her] money was in." Notwithstanding this lack of information, she continued to invest more funds with the partnership.

Smith was initially satisfied by Rosenblatt's belief that the investments were conservative, later by her receipt of a higher rate of return and finally, and perhaps most tellingly, by Rosenblatt's personal "guarantee". To Smith, Rosenblatt's oral guarantee was like "money in her pocket," an admission which indicates she relied not on the statement being made about the partnership's investments but, rather, on the person who was making them. Further evidence that no reliance was placed on the alleged representations is indicated by the fact that despite the advice from Pico and Budish, two independent sources who warned her of the possible dangers of this type of investment, Smith clung to her belief that Rosenblatt would deliver. As the court explained in *Schwartz v. Goldstein (In re Goldstein)*, 105 B.R. 1016, 1017 (Bankr.S.D.Fla.1989), where a creditor insists on investing without adequate knowledge of the debtor's business and after two trusted advisors (her husband and a friend) refuse to make the same investment, the creditor's blind faith will not support an objection to discharge.

As in *In re McIntyre*, 64 B.R. 27 (D.N.H.1986), "[s]imply stated, the evidence here is to the effect that [the debtor] believed in his venture and thought that he could (given the proper amount of investment) return dividends to those who invested in him." 64 B.R. at 29. Equally applicable here is Judge Schwartzberg's observation that what caused the creditor's loss in *In re Schwartz* was the threefold failure of the social relationship, the resources which suggested affluence and the repayment of loans that the creditor had come to expect from the debtor. 45 B.R. at 357. As in *Schwartz*, these three factors alone do not add up to nondischargeability under § 523(a)(2)(A).

Having found that Smith has not established that the partnership could not repay her within 30 days, I need not dally long with her alternative request that the debt be declared nondischargeable pursuant to § 523(a)(2)(B). Under this latter section, a debt will not be discharged when money, property or services are obtained by the use of a materially false written statement respecting the debtor's financial condition upon which a creditor reasonably relied. Smith has not shown that the written statements upon which she purportedly relied were false. Accordingly, I need not resolve the parties' dispute over whether the letters constituted a statement of financial condition as required under that subsection of the statute.

Judgment is rendered for the defendants dismissing Smith's complaint in its entirety.