In re John W. **WELCH**, Debtor.

**MORRIS STREET ASSOCIATES, I, Thomas Cristofaro, George Tartsinas, Stanley Johnson and Patricia Twachtman, Plaintiffs,**

v.

**John W. WELCH, Defendant.**

**Bankruptcy No. 95–23268.**
**Adversary No. 95–2300.**

United States Bankruptcy Court,
D. Connecticut.

July 29, 1997.

Timothy Brignole, Timothy Brignole & Associates, Hartford, CT, for Plaintiffs.

Deborah W.A. Eliason, Adams & Eliason, Enfield, CT, for Debtor–Defendant.

## MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I.

The plaintiffs, Morris Street Associates I ("MSA"), Thomas Cristofaro ("Cristofaro"), George Tartsinas ("Tartsinas"), Stanley Johnson ("Johnson") and Patricia Twachtman ("Twachtman"), on November 7, 1995, filed a joint complaint in this Chapter 7 case against John W. Welch, the debtor, objecting to the discharge of each of their unliquidated claims,[1] pursuant to Bankruptcy Code § 523(a)(2)(A) and (4).[2] The plaintiffs claim they incurred losses in a real estate venture due to the debtor's fraud. Following a four-day trial, the parties submitted memoranda of law.

### II.

The debtor, a certified public accountant licensed to practice in Connecticut, had for several years performed accounting services for each of the individual plaintiffs. He had

---

1. The complaint also included § 727(a)(2) objection to discharge, but the plaintiffs abandoned that objection at trial.

2. Section 523(a) provides:
   (a) A discharge ... does not discharge an individual debtor from any debt—
   . . .
   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

   (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
   . . .
   (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.
   11 U.S.C. § 523(a).

also performed such services for a general partnership, PKG Associates ("PKG"), which owned two apartment-house properties in Hartford, Connecticut, known as 64–66 Morris Street and 68–70 Morris Street.

PKG wished to sell both properties. The debtor maintained a list of his clients who had indicated an interest in making real estate investments. He had, in the past, suggested real estate investments to these clients and several, including two of the individual plaintiffs, had acted on his recommendations and participated in such investments. In August or September 1987, Lucius Pettingill ("Pettingill"), a PKG partner, asked the debtor if he knew of possible buyers for the Morris Street properties. Pettingill provided the debtor with an income statement and appraisal for 64–66 Morris Street on which there was a six-unit apartment building ("the property").

Although the debtor started to locate buyers for both Morris Street locations, he soon limited his search to buyers for the property. The debtor prepared two cash-flow projections and financial analyses based upon the documents received from Pettingill ("the analyses")—one in October 1987, and one in approximately March 1988. He used the analyses when he contacted potential investors on his list. The four individual plaintiffs are the debtor's clients who acted on his recommendations and became investors in the property by purchasing partnership interests in MSA.

The debtor retained Attorney Richard H. Hartley III ("Hartley") of Kane & Hartley P.C. to form M.S.A. as a Connecticut general partnership to become the property titleholder. Hartley represented M.S.A. at the title closing. At that time, Hartley was a law partner of Thomas P. Kane ("Kane"), a PKG partner. The debtor disclosed to potential investors that the investment was to be short-term, that the property would be converted to a condominium form of ownership after purchase, with the condominium units to be placed immediately on the market for sale. Hartley's law firm was to prepare the necessary documentation for such conversion.

The M.S.A. partnership agreement ("the agreement"), drafted by Hartley at the debtor's request, appointed the debtor, who was not to be a partner, to manage partnership assets at an annual fee not to exceed $1,000, and named the debtor as the exclusive marketing agent for partnership assets at specified compensation. The individual plaintiffs were to receive partnership distributions based upon the amounts of their respective capital contributions to the partnership. The agreement contained the following paragraph.

12. By execution of this agreement, the parties hereto appoint JOHN W. WELCH as agent and attorney in fact for the purpose of executing in the name, place and stead of all of the partners any legal documents necessary to the business of the Partnership.

*Exh. 3.*

The debtor had contacted United Bank & Trust Company ("United Bank") to seek mortgage financing for the proposed purchase. United Bank agreed to provide mortgage financing of $300,000, with a five-year term and interest-only monthly payments at prime plus 1.5% interest, provided it received acceptable personal financial statements from each of the M.S.A. partners and each partner's personal guaranty of a percentage of the mortgage loan.[3] Hartley undertook to prepare such guaranties. Hartley also prepared separate letters for each partner to sign in which each acknowledged disclosure by Hartley of the conflict of interest resulting from Kane & Hartley, P.C. representing both buyer and seller in the purchase of the property and resulting from Kane's position as a partner of the seller, and waiving all claims based on such conflict ("the conflict letter").

The October 1987 analysis which the debtor had prepared listed "Capital required" of

---

**3.** United Bank required each of the four individual plaintiffs to guaranty that portion of the $300,000 loan equal to 1.2 times their partnership interest.

$255,645; a $225,645 "Required down payment"; $15,000 "Working capital"; $10,000 "Closing fees"; $5,000 "Other"; and maximum debt service coverage of $216,355 "at 10%, 25 year." *Exh. 26.* The analysis also showed a "Selling Price" of $442,000 and an "Operating cash flow" of $23,600. *Id.* A separate page itemized income and expenses to justify the annual cash flow figure. The debtor testified he advised the individual plaintiffs that the $10,000 closing fee was his charge for putting the deal together.

The March 1988 analysis showed a sales price of $425,000, a down payment of $208,480, and a "2nd mortgage" of $28,480. *Exh. 27 at 2.* There was no reference to a $10,000 closing fee.

The closing of the sale of the property took place on May 4, 1988. None of the individual plaintiffs attended the closing, with the debtor executing all documents as MSA's attorney in fact. The closing settlement statement (the "closing statement") prepared by Hartley listed a sale price of $425,000; a United Bank first mortgage $300,000 loan; a second purchase money $50,000 mortgage to PKG; with "cash from borrower" of $78,284.74, after adjustments for taxes, rent, security deposits, water and mortgage fees. *Exh. 20.*

The closing statement disclosed a broker's commission of $15,000 due from PKG to "Realcorp." Realcorp was the building management company PKG had retained to manage the property. Michael Shvonski was Realcorp's principal.

The individual plaintiffs, either before or after the closing, made the following capital contributions to the M.S.A. partnership: Cristofaro, $100,000; Tartsinas, $25,000; Johnson, $25,000; and Twachtman, $25,000. In the personal guaranties given to United Bank, Cristofaro agreed to guaranty 62.5% of the $300,000 loan,[4] and the other three individual plaintiffs each agreed to guaranty

20.83% of the loan. The debtor had submitted unsigned financial statements for each individual plaintiff to United Bank. Prior to the closing, Hartley had mailed the guaranty and note directly to Cristofaro for review and signature and to Johnson and Tartsinas, care of the debtor.

The debtor testified that as the closing date neared, certain additional investors had not yet decided whether to participate in MSA. The debtor advised Pettingill that in order to close, PKG needed to make certain concessions. One was that PKG take back a "temporary" second mortgage for $50,000 until the new investors made their contributions, and another was that PKG pay the debtor's $10,000 closing fee. Pettingill agreed. The additional investors never became partners, but M.S.A. paid off $45,000 of the second mortgage during the year following the closing.

The debtor stated he was not involved in the drafting of the closing statement and does not know why the closing statement showed a commission due Realcorp of $15,000. Shvonski testified Realcorp was not a broker for the sale of the property, and when Kane delivered the $15,000 to Shvonski, Kane told him to deposit it in the property escrow account. Shvonski sent the $15,000 to the debtor in July 1988. Kane testified the $15,000 included bills due the debtor from PKG for accounting services. The debtor testified the additional $5,000 he received was for accounting fees due from PKG.

For the year following the closing, M.S.A. experienced a positive cash flow. But starting in 1989, the individual plaintiffs made additional payments to M.S.A. to meet the monthly mortgage-interest installments. The conversion to condominium ownership was postponed due to the downturn in the Hartford real estate market. Shvonski advised the debtor that conversion would triple

---

4. Cristofaro's guaranty, for example, stated that to induce United Bank to make a $300,000 loan to MSA, "the undersigned guarantees payment of 62.50% and the undersigned's liability shall be limited to that percentage of the outstanding principal and interest due at any given time." *Exh. 17.*

real estate taxes and that the condominium market was deteriorating. United Bank, at some point, had assigned the first mortgage to Fleet Bank. In the fall of 1990, with mortgage-interest payments then in default, Fleet Bank made demand upon the individual plaintiffs under their personal guaranties. Cristofaro testified that shortly thereafter, in 1991, Fleet Bank held a meeting with the individual plaintiffs who made mortgage-interest payments in an attempt to renegotiate the loan.

Cristofaro testified that as of the commencement of the trial, M.S.A. still owned the property, that all units but one were vacant, and that although on the market for sale, no offers had been received for its purchase. The plaintiffs, on November 12, 1991, had commenced state-court actions against the debtor, Kane and Hartley. The debtor filed his Chapter 7 petition on September 20, 1995. Tartsinas testified that Kane and Hartley paid approximately $150,000 to the plaintiffs in settlement of the litigation as to them. The debtor testified that as a result of litigation with Fleet Bank, the first-mortgage debt had been reduced by $100,000, and satisfied.

### III.

#### A.

#### THOMAS CRISTOFARO

Cristofaro is the owner of several businesses and income-producing properties. He has retained the debtor as his accountant since the early 1980's. He testified the debtor suggested to him that he invest in the property because the conversion to condominium ownership and subsequent sale would yield a substantial profit. Cristofaro eventually invested $100,000, and made a final $15,000 payment, after the closing, on July 23, 1988.

Although Cristofaro conceded he signed the partnership agreement, the guaranty and the conflict letter, he testified he declined to read any of those documents because of his

trust in the debtor. He denied that he was aware that the debtor was to receive a $10,000 closing fee, that he would become personally liable under the guaranty for 62.5% of the $300,000 loan, and that one law firm represented both the buyer and the seller of the property. He did not recall giving the debtor permission to submit his financial statement to United Bank. On the other hand, he testified he still trusts the debtor as an accountant and continues to retain him to do the accounting work for himself and his businesses.

The debtor testified he fully reviewed with Cristofaro the details of the property purchase, the intention to convert to condominium ownership and the potential profit; that he prepared Cristofaro's financial statement, with Cristofaro's approval, from records in the debtor's possession; and that he recalled discussing the partnership agreement with Cristofaro and the power-of-attorney provision which allowed the debtor to sign all papers.

#### B.

#### GEORGE TARTSINAS

Tartsinas is a businessman who has operated several restaurants and is the owner of two shopping plazas containing approximately 30 tenants. The debtor had been his accountant for four or five years. Tartsinas, in February 1988, invested $25,000 in M.S.A. after the debtor, in October or November 1987, reviewed with him the October analysis and explained the venture. Tartsinas testified that although he had been in the United States for over 30 years, he did not read or write in English, and that when he signed the partnership agreement and the guaranty (along with his wife) he did not understand their contents.

The debtor testified that he had discussed with Tartsinas the closing fee, the terms of the mortgage loan, the guaranty and the fact that Tartsinas would not have to attend the closing. The debtor stated he was not aware that Tartsinas claimed not to read or write

English, and that when Tartsinas appeared at the debtor's office in February 1988 to leave his $25,000 check, Tartsinas, after receiving further explanation, signed both the partnership agreement and the conflict letter at that time.

## C.

### STANLEY JOHNSON

Johnson is the retired owner of a small tool business, and the debtor had been his accountant for the past 12–13 years. Johnson testified that he had satisfactorily invested in two previous real estate ventures at the debtor's suggestion and trusted him completely. After the debtor advised him that the property purchase and its conversion into condominium ownership would be a profitable investment, he invested a total of $25,-000 in MSA, paying $15,000 on January 25, 1988 and $10,000 on December 13, 1989. Although he conceded signing the partnership agreement and the guaranty, he denied that he was aware of his personal liability as a general partner and under the guaranty agreement. He denied signing the conflict letter although he conceded his signature appears on it.

The debtor testified that at his first meeting with Johnson, he explained the basic structure of the venture to Johnson, reviewed the October analysis with him and described the potential profit. The debtor stated that at the second meeting with Johnson, they reviewed the partnership agreement and conflict letter, both of which Johnson signed. At this meeting, Johnson gave the debtor his $15,000 check and agreed to a further contribution of $10,000, which he made seven months after the closing.

## D.

### PATRICIA TWACHTMAN

Twachtman testified that she was introduced to the debtor in 1982 by Kane, who was her attorney, and the debtor, thereafter, prepared her tax returns. Prior to her investment in MSA, she had invested in a real estate venture at the debtor's suggestion. After two meetings with the debtor to discuss the property purchase, she declined to invest. But on Kane's advice, she decided to become a partner, paying $15,000 on January 21, 1988, and $10,000 in July 1989. Although she agrees she signed the partnership agreement and the guaranty, she testified she did not understand the extent of her liability or that the debtor was to receive a closing fee. She denies having signed the conflict letter.

The debtor testified that he met with Twachtman on three occasions before she agreed to make an investment and that during those occasions he disclosed his $10,000 closing fee, the conditions of the purchase of the property, and the extent of her liability to United Bank.

## IV.

The plaintiffs' post-trial brief emphasizes that each of the individual plaintiffs, having known and trusted the debtor as their accountant over extended periods of time, were fully justified to rely completely upon his advice. They contend the debtor did not tell them, and they did not know, that they would become personally liable for an amount in excess of their investments and that the debtor received a "closing fee" upon the sale of the property.

The plaintiffs assert they have "three essential claims" against the debtor: that the debtor (1) "recklessly and fraudulently [made] false statements so as to induce the Plaintiffs to giving their money and incur debt"; (2) "as a fiduciary, breached his duty to the Plaintiffs for his own personal gain; i.e., the commission"; and (3) "placed them into an investment for his person [sic] gain which he knew, or should have known, was under-capitalized, excessively debt burdened, had a negative cash flow and had open-ended general liability to the investors—all of which was undisclosed." *Plaintiffs' Brief* at 10–11. The plaintiffs argue they are entitled to "their original investment plus costs and expenses paid to extinguish the debt" plus 10

percent interest from November 12, 1991, when they started their state-court action against the debtor. *Id.* at 26, 27.

The debtor's brief contends that all his representations were truthful and not made with any intent to deceive, that the individual plaintiffs "could not justifiably rely on Welch to the exclusion of their own judgments" and that they "have not proved that any damages which they sustained are a proximate result of fraud committed by the Debtor." *Debtor's Reply Brief* at 3–7.

## V.

### A.

■ On the date of the debtor's petition, the plaintiffs' claims against the debtor's estate were unliquidated.[5] Whether the plaintiffs hold valid claims against the debtor's estate must be established before the court may address the issue of dischargeability of these claims. It is state law that supplies the rules to determine the validity of claims against the estate. *See Grogan v. Garner,* 498 U.S. 279, 283–84, 111 S.Ct. 654, 657–58, 112 L.Ed.2d 755 (1991) ("The validity of a creditor's claim is determined by rules of state law.... [T]he issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code.").

■ The plaintiffs' claims include allegations of the debtor's improper actions while the individual plaintiffs were in a confidential or fiduciary relationship with the debtor. Connecticut case law describes such a relationship as a situation "in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Harper v. Adametz,* 142 Conn. 218, 225, 113 A.2d 136 (1955).

■ Taking into account the significant number of years that the debtor was the tax advisor to each of the individual plaintiffs, the debtor's solicitation of these plaintiffs to invest in a real estate venture which he orchestrated, and that the debtor dictated the terms of the agreement in which the plaintiffs conferred upon him unrestricted authority to sign all partnership-related legal documents on their behalf, the court finds that Connecticut courts would hold a confidential or fiduciary relationship existed between the individual plaintiffs and the debtor. The effect of such a finding under Connecticut law imposes a twofold burden on the debtor. "Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary.... Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." *Oakhill Associates v. D'Amato,* 228 Conn. 723, 726–27, 638 A.2d 31, 33 (1994) (citations and internal quotation marks omitted).

### B.

With the foregoing precepts in mind on the issue of whether the individual plaintiffs have established their claims, the court makes the following findings. The court believes that the individual plaintiffs were all generally competent and knowledgeable people, clearly capable of forming their own opinions and with prior experience in the purchase of real estate. While they all claim to have declined to read any of the documents which they signed in order to participate in the real estate venture, none claim the debtor asked or persuaded them not to read such documents. The court finds more persuasive the evidence that the debtor truthfully explained the pertinent details of the venture at the time he spoke to each of them.

The individual plaintiffs and the debtor agree that the decision to purchase the property was not based upon M.S.A. retaining the

---

5. Each of the plaintiffs filed in the debtor's estate identical proofs of claim in the amount of $350,- 000, asserting as the basis of the claim: "Claim Debtor defrauded Creditor out of this money."

property to operate as a multi-family apartment building. They agree that this purchase was to be a short-term investment, and they intended to immediately convert the building to condominium ownership and sell the units. Although the plaintiffs' brief suggests that the condominium conversion did not take place due to the debtor's inattention, the court finds more persuasive the debtor's statement that the unprecedented real estate recession which descended upon the Hartford area in 1988–1989 was the cause for the decision not to make the conversion.

Although the debtor's financial analyses projecting the cash flow from the operation of the property based on Pettingill's figures were flawed, the court does not find that the debtor knew these projections to be unreliable. Both Twachtman and Tartsinas testified that the debtor mentioned that they might double their money upon the sale of the condominiums, but neither indicated that they believed this representation to be a statement of fact.

The plaintiffs' brief claims that the debtor told them that M.S.A. was purchasing two buildings rather than one. The record does not reflect any testimony of the individual plaintiffs that they thought they were investing in two buildings.

■ The debtor conceded that the decision was his alone to close on the property without obtaining the commitments of all of the anticipated investors, and he did not tell any of the individual plaintiffs prior to closing of his decision to execute the $50,000 second mortgage. The failure of two potential investors to participate placed an additional burden on M.S.A. to repay the second mortgage from cash flow. While MSA's cash-flow problems were also affected by the existing poor real estate market, the debtor's decision to close without the additional investments was the product of poor judgment. The court finds that the debtor has not satisfied his burden of proving, by clear, convincing and unequivocal evidence, that he dealt properly with the individual plaintiffs when he committed their investments to the purchase

of the property under the circumstances. He may have been influenced by the fact he personally would receive monies at or shortly after the closing. Accordingly, the court concludes that the individual plaintiffs each have claims against the debtor's estate. For reasons hereinafter stated, the court, in this proceeding, cannot decide the amount of each claim.

## VI.

■ Having concluded that the plaintiffs hold valid claims against the debtor's estate, the court turns to the issue of whether the claims are excepted from the debtor's discharge due to the debtor's fraud. In this instance, the burden of proof is on the plaintiffs, and the standard of proof is the preponderance of the evidence. *Grogan*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755. The court concludes that the plaintiffs have not met this burden of proof and that the debtor's obligations to the plaintiffs are dischargeable.

### A.

### Section 523(a)(2)(A)

■ "Under § 523(a)(2)(A), 'a debt may be determined nondischargeable based on fraud where the creditor proves that: (1) the debtor made the representations; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representations; (5) the creditor sustained the alleged loss and damage as the proximate result of the representation having been made.'" *Harper v. Richey (In re Richey)*, 103 B.R. 25, 29 (Bankr.D.Conn.1989) (citations omitted). The level of reliance is justifiable reliance. *See Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). "To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient." *Smith v. Meyers*

*(In re Schwartz & Meyers)*, 130 B.R. 416, 422 (Bankr.S.D.N.Y.1991).

■ As discussed in Section V.*B.*, *supra*, the court does not find that the debtor made any representations to the individual plaintiffs that he knew were false or made with the intention to deceive in order to induce the individual plaintiffs to invest. The debtor's poor business judgment to close does not equate with a finding of actual fraud required by § 523(a)(2)(A). There could not have been a worse timing for this type of real estate venture to commence in the Hartford area. The court concludes that the plaintiffs have failed to prove that the debtor obtained money from them through representations which he believed to be false at the time he made them with the intent to deceive each plaintiff. Accordingly, the claims owed the plaintiffs are dischargeable under § 523(a)(2)(A).

### B.

#### Section 523(a)(4)

■ Under § 523(a)(4), the plaintiffs must establish that a fiduciary relationship existed between the plaintiffs and the debtor and that fraud or defalcation was committed in the course of that relationship. *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir.1996). The existence of a fiduciary relationship pursuant to this section is determined by federal law, although state law may be a factor. *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 n. 2 (6th Cir.1982).

■ It is generally accepted among courts of appeals that an express or technical trust must be present for a fiduciary relationship to exist, rather than "a general fiduciary duty of confidence, trust, loyalty and good faith," or "an inequality between the parties' knowledge or bargaining power." *Young*, 91 F.3d at 1371–72 (citations omitted); *Perdue v. Cantrell (In the Matter of Cantrell)*, 88 F.3d 344, 347 (5th Cir.1996);

*R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir.1997) ("The attorney-client relationship, without more, is insufficient to establish the necessary fiduciary relationship for defalcation under § 523(a)(4). Instead, the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of a § 523(a)(4).").

It is questionable whether the debtor qualifies as a trustee under § 523(a)(4) but, even if he does, the court has concluded that he committed no fraud or defalcation, and, accordingly, the plaintiffs may not except their claims from discharge under § 523(a)(4).

### C.

■ Although a ruling on the extent of the plaintiff's claims is not necessary in light of the conclusions reached by the court as to dischargeability, the court notes that the record is not adequate to determine the amount due each plaintiff "It is axiomatic that the burden of proving damages is on the party claiming them.... When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." *Lawson v. Whitey's Frame Shop*, 241 Conn. 678, 689, 697 A.2d 1137 (1997) (citations and internal quotation marks omitted).

MSA still owns the property. No credible evidence was introduced to establish the present value of the property. In addition, there was testimony that the plaintiffs in the state-court action against Kane and Hartley received a settlement of approximately $150,-000 and that the bank loan was paid off at a lesser amount. The lack of an appraisal of the property, an explanation of the $150,000 settlement, and information on the bank loan bars the court from determining the extent of the damages due each plaintiff. *Cf. Burkhardt v. Armour & Co.*, 115 Conn. 249, 257, 161 A. 385 (1932) ("The general rule is that there can be but one satisfaction of damages ...."), *overruled by, Porpora v. City of New Haven*, 122 Conn. 80, 95, 187 A. 668 (1936), *and reaffirmed, Foran v. Carangelo*, 153 Conn. 356, 216 A.2d 638 (1966).

## VII.

### *CONCLUSION*

Judgment shall enter for the debtor that the objection to his discharge is overruled and that his obligations to the plaintiffs are discharged. It is

SO ORDERED.